EVA E. ROBERTSON, Appellant, v. CARSON H. CAMPBELL et al., Appellees.

**WITNESSES:   Competency—Mother of Bastard—Paternity.**  The
1   mother of an illegitimate child is a competent witness as to the paternity of such child, even though the person testified to as being the father is dead, the mother not being within the prohibition of Sec. 4604 of the Code, relating to testimony of transactions with persons since deceased.

**BASTARD:  Right to Inherit—Paternity—Recognition of—Sufficiency**
2   **of Evidence.**  Evidence reviewed and held sufficient to establish the paternity of one seeking to inherit as an illegitimate child and the general and notorious recognition of such paternity by one deceased.

**WITNESSES:   Transaction with Deceased—What Is Not.**  A party
3   to an action is not prohibited by Sec. 4604, Code, from testifying against the heirs of a deceased person as to matters which do not constitute ''personal transactions or communications'' between such party and the deceased.

PRINCIPLE APPLIED: Plaintiff, seeking to quiet title against the collateral heirs of a deceased on the ground that she was the illegitimate child of deceased and generally and notoriously recognized by him as such, was permitted to testify, ''That in early life she learned from an aunt that deceased was her father; that at school she suffered slights because of her parentage; that she first met deceased at a hotel when other persons were present; that one of these latter persons introduced the deceased as her father; that she and deceased visited together during the day; that she heard her sister introduce deceased to another person as her father; that she saw deceased at a certain home when a lady called her and said: 'Eva, here is your father'; that she wrote and mailed letters to the deceased.''

**BASTARDS:   Paternity—General Repute—When Admissible.**  Gen-
4   eral repute through a neighborhood that a deceased was the father of an illegitimate child, when supplemented by substantive

facts tending to show that such reputed relation actually existed, is admissible as bearing on the question of paternity, but not on the question of the recognition of such paternity by deceased.

**BASTARDS:** Evidence—Paternity—Declaration of Deceased—Competency. Declarations of a deceased, denying the paternity of a certain child, are competent on the question of recognition of such paternity.

*Appeal from Jasper District Court.*—Hon. BYRON W. PRESTON, Judge.

SATURDAY, MAY 16, 1914.

REHEARING DENIED, WEDNESDAY, DECEMBER 16, 1914.

ACTION in equity to quiet title to real estate by an illegitimate child against the collateral heirs of a decedent.—*Reversed.*

*H. C. Lounsberry, Henry Silwold, Morgan & Korf, Dawley & Wheeler* and *Binford & Farber,* for appellant.

*Bradford & Johnson, McElroy & Cross, McLain & Campbell, E. E. Ogg* and *O. W. Emmons,* for appellees.

WITHROW, J.—I. Thomas R. Campbell died unmarried and intestate in Jasper county, Iowa, in September, 1911, possessed of real estate and personal property of large value. Following his death, the plaintiff brought this action in equity to quiet title in her to all the real estate, averring that she was the illegitimate child of Thomas R. Campbell, that she was born on or about February 25, 1869, in Timber Creek township, Marshall county, Iowa, and that during the lifetime of her said father, she was recognized by him as his child, and that such recognition was general and notorious. The answer denied that plaintiff was a daughter of Thomas R. Campbell, and that he had ever recognized her as his child. The trial court found against the plaintiff, and this appeal is brought by her.

II. The law which generally governs cases of this nature is quite well settled. Sec. 3385 of the Code provides that illegitimate children shall inherit from the father when the paternity is proven during his life, or they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing. It is not claimed on this appeal that the proof will support a recognition in writing. Two ultimate facts are, therefore, necessary to be proven: First, that the claimant is the illegitimate child of Thomas R. Campbell; and, second, that he generally and notoriously recognized her as such. As to this latter requirement, this court has held that it is not necessary that the recognition should have been universal, or made known to all or a majority of the community. *Van Horn v. Van Horn,* 107 Iowa 247; *Morgan v. Strand,* 133 Iowa 299. But it is sufficient "if, in his intercourse with neighbors, associates, and friends, he makes no attempt to conceal the relationship he bears to the child, but acknowledges it openly whenever any reference to the subject is made, and this recognition is so often repeated as to evidence his willingness that all who care to know the truth may understand that he is the father of the child." *Tout v. Woodin,* 157 Iowa 518; *Hays v. Claypool,* 164 Iowa 297.

In *Van Horn v. Van Horn, supra,* the words "general" and "notorious" are in this connection construed as meaning, respectively, "extensive, though not universal," and "open."

In support of such an issue, declarations by the father as to the paternity of a child made during his lifetime may be shown. *Alston v. Alston,* 114 Iowa 29; *Eisenlord v. Clune* (N. Y.), 12 L. R. A. 836. And evidence of declarations which would ordinarily be hearsay is competent as bearing upon proof of pedigree, when the person who makes them was likely to know and is dead. *Jackson v. Cooley,* 8 Johns. 125; *Stein v. Bowman,* 38 U. S. 209.

III. Mrs. Armilda Wilson was called, and testified that she was the mother of the appellant, and that Thomas R.

Campbell was her father.  Her testimony was objected to as being incompetent, and the witness incompetent under Code, Sec. 4604, as a personal transaction, it being urged that the right claimed by the appellant depended for its existence and validity upon a transaction between the deceased and her.  In support of this position, appellees cite *McClanahan v. McClanahan*, 129 Iowa 411, 413.  The decision in that case was based upon the facts that whatever rights were held by the claimant against the estate arose out of a trust relation, and from the alleged payment to the deceased by the witness, who was alleged to be incompetent.  It was there held in general terms that if the right asserted by a claimant depends for its existence and validity upon a transaction between the deceased and a third person, the evidence of such third person shall not be allowed to prove the transaction.  The prohibition of the statute applies to ''any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise.''  The interest which disqualifies a witness from testifying must be present, certain, and vested.  *Clinton Savings Bank v. Underhill*, 115 Iowa 292.  The interest which is derived from an assignment or otherwise must be of a nature to meet that requirement.  Conceding that appellant's right of inheritance must depend, among other things, upon the fact of the illicit relations between her mother and Thomas R. Campbell, that interest or right was at no time held by the mother, and, of course, falls without the provision as to rights derived by assignment.  Neither did the mother have a legal right in the property of Campbell which passed by succession or by other lawful means of transfer to her daughter; and this, we think, must be the test in giving meaning to the words, ''or otherwise,'' when taken in connection with the clause of the statute of which they are a part.  We think the witness was competent.

IV. Other questions bearing upon the admissibility of

1. WITNESSES: competency: mother of bastard: paternity.

evidence arise in the case, which will be considered in connection with a review of the proof.

V. About seventy witnesses were examined on the trial; their testimony covering a period of many years. The following facts appear without substantial dispute: In 1868, Thomas R. Campbell, an unmarried man, was engaged in the business of buying and selling cattle in Marshall county and adjoining counties, and was reputed to be well to do. He became acquainted with Armilda Ferguson, a widow with minor children, her husband having been killed in 1864, as a soldier in the Civil War. On February 26, 1869, she gave birth to an illegitimate daughter, this appellant. On March 31st, following the birth of the child, she commenced bastardy proceedings against Campbell in the district court of Marshall county, and in September of the same year, commenced a civil action against him, claiming damages for seduction. In each case, she alleged he was the father of her illegitimate child. During the pendency of such actions, in November, 1869, the defendant, Campbell, filed a motion and his affidavit for continuance because of the absence of a material witness, Mary Renner, by whom, as he swore, he expected to prove that Armilda Ferguson was a woman of bad repute, lewd and unchaste, and that prior to the pretended seduction, she had been pregnant, and that said witness was present at her premature confinement. In February, 1870, a stipulation of settlement was filed, in which it was stated "that by way of compromise and settlement, but without admitting the charges against him, but only for peace and to avoid expense and vexation," the defendant was to pay the costs of the suit, and the sum of $100, in full of all demands. This stipulation appears to have been filed in the civil action for seduction; and upon the record of the bastardy proceedings, which were brought in the name of Marshall county on the complaint of Armilda Ferguson, appears the word "settled." In 1871, Mrs. Ferguson married O. R. Wilson, at the time having four living children of her

2. **BASTARD: right to inherit: paternity: recognition of: sufficiency of evidence.**

first marriage. On the trial of this case, she was seventy-four years old. She testified to her residence in Timber Creek township about ten or twelve years, and that in 1867, while residing there, she became acquainted with Thomas R. Campbell, first through the sale of a cow, after which, at intervals of from two weeks to a month, he called upon her, generally on Sunday afternoons. The subject of marriage was discussed between them, and she testifies that there was a promise of marriage prior to the time of the act which she claims resulted in her pregnancy. After that, she testified, he said he would marry her but would not take all the children. The intercourse occurred in June, 1868, according to her testimony, and the child, Eva E., this appellant, was born in February following. The witness further testified that Campbell came to see her within a short time after the birth of the child, and that such visits continued at intervals of not to exceed one month until the time of her marriage, in 1871; that at different times he took the child on his lap, said that she was a Campbell, and that he requested that her picture be taken, which the witness said she had done, and that he took one of them to show his mother. According to her testimony, these visits continued after the bringing and settlement of the suits against him; and on one occasion he said to her that she would have got more if she had not sued him. She also testified that, upon her marriage to Mr. Wilson, she told him the child was Campbell's. We cannot, because of its length, set out her testimony in full; its entire tendency was to show the relations between herself and Campbell and his admission of paternity.

Jennie Edmonds, a half-sister of the appellant, testified to her residence at home in Timber Creek township up to the time they moved to Marshalltown; that Campbell came to the home before the birth of Eva, and after that event; that he took the child in his arms and called her his baby daughter.

She also remembered, as she said, his asking her mother for a picture of the baby. At this time, the witness was about

ten or eleven years of age. She further testified that in 1887, she lived in the town of Ferguson at a hotel where her brother, D. J. Ferguson, and the appellant were staying; that at one time, Campbell came to the hotel, inquired for Eva, called her his daughter, and said he had come to see her; that they visited together, and upon leaving, he gave Eva some money. The witness further said that on this day, she introduced Campbell to a Miss Hilsaback as Eva's father. The witness testified that, prior to this visit, she read a letter to Campbell written by her half-sister, and that within a week or ten days, she read a letter addressed to Eva, bearing the signature of Thomas R. Campbell, and shortly afterwards, another one from him to Eva, in both of which, as she testified, he called her his daughter. These letters were not introduced in evidence, the preliminary proof showing that they were lost. Objection was made to proof of their contents. This question will be later considered.

- D. J. Ferguson, a half-brother of the appellant, born in 1862, testified to visits of Campbell to their home during their residence in Timber Creek township. He also, over the objection already noted, testified to having mailed a letter for his half-sister, addressed to Thomas R. Campbell at Lynnville, some time in June or July, 1887; that she permitted him to read the letter, and that in its body it addressed Campbell as "dear father"; that following that, he saw and read a letter from Lynnville signed Thomas R. Campbell, in which he addressed her as "dear daughter Eva." The witness said that, following this letter, in a week or ten days, Campbell came to Ferguson, calling at the hotel with one Powers, and that the latter said Campbell had come to see his daughter. As to further matters relative to that day, his testimony is, in substance, the same as that of the witness, Mrs. Edmonds.

William Powers testified, in substance: Fifty years old; knew Campbell in Timber Creek township; knew plaintiff and saw her when she was working at hotel in Ferguson; saw Campbell there during that time; he asked me if I

knew a girl named Eva Wilson; I did; he said, She is my daughter, and I want to see her; I took him down to the hotel, introduced him to her as her father; plaintiff at that time was known as Eva Wilson; I ate dinner with him at the hotel; D. J. Ferguson and Mrs. Edmonds were there; later in the day saw him give Eva money. Afterwards, when I was working for him, when I suggested that he ought to fix his business so that his estate could be easily settled, he said he had but one heir, Eva Wilson. Later, he told me that she had married, and he seemed pleased with her choice. Evidence in impeachment of this witness was introduced on the ground of bad moral character. Much of that which he testified to is corroborated by other witnesses, whose credibility is not directly challenged, save by the alleged improbability and unreasonableness of their testimony.

Eva Robertson, the appellant, testified: Have been a resident of California since 1902; was married in November, 1888; knew Thomas R. Campbell, wrote letters to him, and received letters in reply, two while I was at Ferguson, and several while at Marshalltown; have searched for the letters in my home, but cannot find them. To this line of inquiry, objection was made on the ground that the witness was incompetent under Code, Sec. 4604; and that the offer of the contents of the letters was secondary evidence without proper foundation having been laid, and the latter objection was urged against the testimony of D. J. Ferguson and Jennie Edmonds, already quoted. The testimony of appellant was competent as to the fact of having written letters to Campbell, and of having received reply. *Britt v. Hall,* 116 Iowa 564.

3. WITNESSES: transaction with deceased: what is not.

It having been stated by counsel for appellant that reliance is not placed upon the fact of recognition in writing, and proof of the contents of the letters being material for that purpose, we may disregard them for any other purpose than to show the fact of communication between them, and his visit to Ferguson following the sending of two of them. That

part of her testimony which we consider to be competent was in substance: that when she was about fifteen years old, she learned from an aunt, now dead, that Thomas Campbell was her father, that her mother was living at Timber Creek at the time of her birth; that at school she suffered slights because of her parentage; that she first met Campbell in 1887, at Ferguson, at the hotel, when Powers and her brother and sister were there; that one of them introduced Campbell as her father, and that they visited together during the day; heard my sister introduce him to Miss Hilsaback as my father. Next saw him at the Boles home in Marshalltown, when a lady called me and said, "Eva, here is your father"; wrote and mailed letters to him at Lynnville when I was in Marshalltown, saw him last in 1888; before my marriage told my husband of my parentage.

Valentine Renner, a brother of appellant's mother, testified to a conversation with Campbell after the birth of the child; said he had got into trouble with his (Renner's) sister and wanted him to help straighten it up; refused to do so; later, when the child was ten or eleven years old, he said to me, "I was a fool to try to get you to go with me to your sister's and settle that trouble; they say I have got a nice girl over there."

Many other witnesses testified to direct statements made by Campbell admitting that he was the father of the appellant, or referring to her as his child, or "my baby," and a number of statements, while not in express terms, named or designated her by such reference that, accepting them as true, there was no question as to their application; in all, about twenty witnesses testifying to his recognition of her, at different times extending from after her birth until shortly before his death. To some of them in his later years, when questioned as to his purpose in the disposition of his property, he spoke of his daughter, who would take it all.

It was also shown by many witnesses that, throughout the Timber Creek neighborhood, the appellant was generally

reputed to be the child of Campbell; and there is, as to that neighborhood, no substantial dispute that such was so understood. We recognize that testimony of this kind cannot be determinative of the question, for busy tongues often create undeserved reputations; but it is competent evidence as bearing upon the question of paternity, when supplemented by substantive facts tending to show that such reputed relation actually existed. *Hays v. Claypool, supra; Tout v. Woodin, supra; Alston v. Alston,* 114 Iowa 29; *Van Horn v. Van Horn,* 107 Iowa 247.

*4. BASTARDS: paternity: general repute: when admissible.*

But such evidence could not go to the question of recognition, which is a distinct and necessary ultimate fact in cases of this nature, affirmative in character, and not properly deducible from reputation.

Evidence was introduced, over objection as to its competency, tending to show the declarations of Campbell about the time the early suits were brought or pending, and later, that the child was not his. The objection that such denials may not be considered, as they are self-serving declarations, invokes a rule which we think too narrowly limits the field of legitimate inquiry in cases like this. Recognition of itself involves affirmative acts or statements, in a sense declarations, but more properly to be received and considered as substantive proof of the fact rather than an admission of the fact. As going to the question of general and notorious recognition, and as evidence tending to rebut that fact, we think that proof of denials of paternity is competent, to be weighed by the circumstances under which such denials were made.

*5. BASTARDS: evidence: paternity: declaration of deceased: competency.*

There was proof tending to show that Campbell said the child was not his; that her father was a physician of the neighborhood; and much evidence was introduced to show a resemblance in hair, actions, and other respects between her and the physician. Beyond the fact of some resemblance, there was no proof that she was the child of the physician. There

was evidence to the effect that during the pendency of the proceedings against him, Campbell said she was the doctor's child; but the mother testified that she was not, and that she had had no unlawful relations with any other man than Campbell. Taking the denials of Campbell in the strongest sense that can be claimed for them, with but few exceptions they were made at a time pending or immediately following the settlement of the proceedings against him, and were in line with the protective measures adopted by him for his defense. When freed from the question of liability or the influences of the proceedings, the evidence shows but few statements by him in contradiction of his parentage. One of these occurred about two years before the trial of this case, when a witness stated that he was laughing at Campbell about the suit of forty years ago, and that the latter said the child was not his, it was red-headed.

The census taker of 1910 testified that, in the performance of his duty, he asked Campbell if he had a wife, to which he answered no; and upon inquiry as to whether he had children, said, "If I have any I don't know who they are." This answer was not a direct denial, nor fairly subject to that construction, but was on its face equivocal. The residence of Campbell was at Lynnville, Jasper county, which is about thirty miles from Timber Creek. A number of witnesses from the neighborhood of his residence, some of them long-time acquaintances, testified that they had never heard of his having a daughter or heard him speak of having one; but this testimony is purely of a negative character, and when considered in connection with the fact that their residence was in a community some distance away from that of the birth and subsequent life of the child, we think is of little, if any, weight.

The denial by Campbell in the seduction and bastardy proceedings and his settlement of the cases without admitting liability are proper to be considered, but in view of the usual and known tendency to make defense, supported by a denial when pecuniary liability is claimed because of such charges,

we think such denials are not entitled to great weight; and while the adjustment of the suit may not, under such condition, with the reservation which was made, be taken as an admission of paternity, neither does its denial strongly tend to establish the contrary.

The defense also introduced testimony to show that in 1867-8, the general moral character of Mrs. Ferguson was bad, as tending to support the claim that the child could not certainly be determined to be Campbell's. Testimony to meet this was introduced; and we are of opinion that practically all of the community talk upon which proof of reputation was based arose out of the birth of the appellant as an illegitimate child.

A witness, Adaline Smith, formerly McAchren, then a girl of fifteen or sixteen years, testified to having been at the home of Mrs. Ferguson during the summer of 1867 or 1869 to assist in her illness, and that she found the bedclothing in such condition, bloody and soiled; that, from her subsequent experience as a nurse, she now states that she thinks there had been a miscarriage or an abortion. This is denied by Mrs. Wilson (Ferguson) and by others of her neighbors, who testified there was no illness at that time. This proof has bearing only upon the question of her habits with men and her moral character at that time, and we think is not sufficient to sustain that claim.

VI. We have at considerable length set out the substance of the testimony. There may be omissions which one or the other of the parties may consider of importance. If so, such has not been intended. We have carefully read the entire record, and from it reach the conclusion that it satisfactorily shows that the appellant is the child of Thomas R. Campbell; and that during his lifetime, there was by him that extensive and open recognition of her as his child, which under the law was general and notorious, and that, under the facts and the rules of the cited cases, she is entitled to inherit.

It therefore follows that the decree of the trial court must be—*Reversed.*

LADD, C. J., DEEMER and GAYNOR, JJ., concur.