No. 20,097.

NOTLEY E. RECORD, *Appellee,* v. CARL ELLIS, as an Individual and as Administrator, etc., et al., *Appellants.*

### SYLLABUS BY THE COURT.

1. ILLEGITIMATE CHILD — *Recognition by Putative Father.* Upon the question of recognition, and especially upon the affirmative of that question, almost all of the evidence was by deposition. *Held,* that on appeal such evidence will be reviewed.

2. SAME—*Evidence Insufficient.* The testimony examined and found not to support a finding of general and notorious recognition by the father of the plaintiff's sonship as required by the statute (Gen. Stat. 1909, § 2956).

Appeal from Meade district court; GORDON L. FINLEY, judge. Opinion filed April 8, 1916. Reversed.

*Francis C. Price,* of Ashland, for the appellants; *H. Llewelyn Jones,* of Meade, of counsel.

*Albert Watkins, Arthur C. Scates,* both of Dodge City, and *Charles Clyde Barker,* of Denver, Colo., for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant, the administrator of the estate of William Ellis, deceased, appeals from a decision adjudging the plaintiff competent to inherit from the decedent. The questions of paternity and of general and notorious recognition are involved. (Gen. Stat. 1909, § 2956.)

The plaintiff, Notley E. Record, son of Mary Record, was born in Pendleton county, Kentucky, January 12, 1873. William Ellis, born and raised in the same neighborhood, was a single man about thirty years of age at this time and engaged to marry Miss Lydia B. Pribble who lived in the neighborhood. On February 26, 1873, Mary Record, a single woman living in the neighborhood, made complaint charging the decedent with being the father of her child. A warrant was issued, and returned on March 20, not executed. Soon after its issuance Ellis went to Indianapolis where in March he was married to Miss Pribble. They lived there until the following year, when they moved to a farm in Morgan county, Indiana, and re-

mained there until 1884, when they moved to Clark county,
Kansas, near the Meade county line, in which vicinity Ellis
and his wife lived together until his death in 1911, two sons,
Frank and Carl, having been born to them.   During these
years Ellis made a number of visits to the old neighborhood in
Kentucky, at which times he made statements and admissions
which fully settle in favor of the plaintiff the question of pa-
ternity and which amounted to a recognition.   It does not
appear, however, that, with one exception, any one ever heard
William Ellis acknowledge the paternity in Indiana, where he
lived for ten years, or in Kansas, where he lived for twenty-
seven years, and his wife and sons up to the time of his death
claimed to have had no knowledge or information concerning
the matter, although the wife, a cousin of Mary Record, had
gone with him on a visit to the old neighborhood in 1883, and
again in 1906, and the eldest son had visited in Kentucky with
friends and relatives in 1904.   One witness, who was visiting
the decedent in Kansas, testified that Ellis requested him to
say nothing to the children here about his life back there, but
the intended significance of this remark is a mere matter of
inference.   Keeping the secret thus well in the neighborhood
where he spent much of his married life and raised his chil-
dren, the question remains whether the recognition shown else-
where fills the requirement of the statute.

In addition to various statements concerning his relations
with Mary Record, and concerning the failure of the constable
to execute the warrant, an old farmer and school teacher tes-
tified that in 1875, in Indiana, when working with Ellis, the
latter would frequently say in a reminiscent way, and some-
times in a jesting way, "I wonder how my boy, or how my
Kentucky stock, is coming on back in Kentucky.   My Ken-
tucky stock, or my boy."   Sometimes he would use the name
Not or Notley, and refer to him as "my boy."   He also testi-
fied that he heard Mrs. Ellis frequently ask something about
her husband's Kentucky stock.   This was denied by Mrs. Ellis.
That when he would accuse Ellis of lying about having such
a boy he would say, "I am not."   Another witness testified that
in 1878, in the old neighborhood, on meeting Ellis, he said,
"How is my boy?" and on being asked What boy? he replied,
"My boy, Not."   Another, that on Christmas, 1883, at a wed-

ding, while the witness and decedent's father-in-law and others were sitting together, Ellis asked the witness: "How is my boy getting along? Is he big enough to do some work? I want to take him west with me to raise corn." The same witness, a brother of Mary Record, testified that in 1909 Ellis came into his booth at a fair at Falmouth, Ky., and asked where the plaintiff was, and requested witness to give him his address, saying: "It is funny I can't find that boy; he is roaming around in the west the same as I am." One witness deposed that before Ellis left he told witness's father that the child was his, and what he was working for was to get away and get shut of it; that on his return visits the witness frequently talked to Ellis about the matter, and he often inquired about the boy; that he heard a conversation between Ellis and the father of witness in which he said he would give the boy something when the time came, but his wife objected to it. Another, that he saw Ellis on a return visit, probably in 1893, rode with him two or two and a half miles, asked him if he had seen his boy since he had come in. He said no, but he would like to see him. He said:

"Well, I would like to see that boy; I would like to take him home with me, if he would go. I have got hold of a good deal of land down there in Kansas which some day will be valuable, and I could give Not a start if he would go home with me."

Another testified that he saw the foot-race when the constable went to arrest Ellis; that in talking about the matter on a return visit Ellis said it was his boy; that when the boy was about twelve or thirteen years old, while witness and Ellis and others were at a certain store, the boy came in for his mail. Some one remarked that that was his boy, and Ellis said, "I reckon it is." Notley Record testified that he never saw Ellis but once in his life, and that was when he was about sixteen; that he had known of his being in the neighborhood at other times, but if he saw him he did not know him; that in the instance mentioned he just happened to meet him at the cross-roads store. The storekeeper winked at Ellis and "I knowed I was trapped then. I had always shunned him," and Ellis there gave him a cigar.

What is meant by the requirement that the recognition must be general and notorious?

The supreme court of Iowa, whose statute is identical with ours, has ruled that "general" means "extensive, though not universal"; and "notorious" is synonymous with "open." (*Van-Horn v. Van Horn*, 107 Iowa, 247, 77 N. W. 846.) As defined by Webster "general" means "common to many, or the greatest number, widely spread; prevalent; extensive though not universal," and "notorious," "generally known and talked of by the public; universally believed to be true; manifest to the world." In *Watson v Richardson*, 110 Iowa, 673, 80 N. W. 407, it was said:

"Both of these words are used in the statute with the design of emphasizing the thought that the understanding of the father's recognition should be as extensive as the immediate community of his residence, and within the common knowledge of the public." (p. 691.)

In other instances the approved definitions were: "Extensive, common to many, or the majority, but not universal." "Not concealed, open, generally or commonly known or spoken of." (*McCorkendale v. McCorkendale*, 111 Iowa, 314, 316, 82 N. W. 754; *McNeill v. McNeill*, 166 Iowa, 680, 703, 148 N. W. 643.) The recognition required is not that of heirship but sonship. (*Alston v. Alston*, 114 Iowa, 29, 86 N. W. 55.) It need not be in a state which permits bastards to inherit. (*Van Horn v. Van Horn*, supra.)

In a recent decision it was held that it is not necessary that it (the recognition) should have been universal or made known to all or a majority of the community, but it was sufficient where the proof showed that the father frankly admitted the relationship when there was occasion for him to speak, and made no attempt to conceal the same, though it also appeared that there were many of his friends, relatives and acquaintances who had no knowledge thereof. (*Tout v. Woodin*, 157 Iowa, 518, 137 N. W. 1001.) In that case there was testimony that the putative father visited the mother while still in bed, held the child in his arms, and brought or sent supplies for its use. It was said that his statements were not made in confidence, but openly and without apparent reserve, and on so many different occasions that the recognition must be held general and notorious, although a number of acquaintances more or less intimate with him testified that they had never heard him admit the paternity of the child. But there were

some twenty distinct acts and statements of recognition. The rule therein announced was quoted with approval in *Hays v. Claypool,* 164 Iowa, 297, 300, 145 N. W. 874, but it was held in the latter case that it was necessary to show that the father acknowledged his parentage openly in his intercourse with his neighbors, associates and friends, whenever reference to the subject was made, without attempting to conceal it, and that the father, having lived fifty-seven years after the plaintiff's birth, no visit, communication or token of remembrance having passed between them, and as only four persons could be produced to whom declarations of parentage were ever made, the right to inherit was not established.

Counsel for the plaintiff call attention to a number of Iowa cases holding the proof sufficient, and we have examined them all. These are *Van Horn v. Van Horn, Alston v. Alston, Tout v. Woodin,* already referred to, and *Morgan v. Strand,* 133 Iowa, 299, 110 N. W. 596, and *Robertson v. Campbell et al.,* 168 Iowa, 47, 147 N. W. 301. In each of these cases save one the evidence of recognition was stronger than that found in the record before us. The exception is the Morgan case, and there the evidence showed statements to several persons, and once or twice publicly in the presence of thrashing crews, a settlement with the mother in a bastardly proceeding by the payment to her of a hundred dollars, and other facts which led the court to observe that there was little doubt of a general and notorious recognition that he had a child "back in Illinois," and that his acknowledgment of having such a child was generally understood in the neighborhood. In each of the other cases thus invoked there was testimony showing some personal recognition of the child by the father in addition to statements of acknowledgment to others.

*Markey v. Markey,* 108 Iowa, 373, 79 N. W. 258, is to the effect that it is not sufficient to show that plaintiff was reared at the home of the deceased in Ireland, when not elsewhere at work, until he reached the age of nineteen or twenty, when he came to this country at the expense of the deceased, and went to his house in Illinois, where he remained for two years; that the deceased furnished him with clothing and spending money, collected his wages, and introduced him as his son to some fifteen persons, five of whom testified to such fact. It was re-

marked that there was no evidence of any recognition while the parties resided in Ireland, nor after they separated in Illinois, nor of any communication between them. In *Watson v. Richardson*, 110 Iowa, 673, 80 N. W. 407, evidence showing that a putative father recognized an illigitimate child as his own in the house of its foster parents during the first year of its life, and occasionally thereafter after removal to another state, was held insufficient, two of the justices dissenting. The McCorkendale case (111 Iowa, 314, 82 N. W. 754) is quite similar to the one under consideration as to the recognition in the state where the child was born, but the right to inherit was denied.

In *Estate of Jones*, 166 Cal. 108, 135 Pac. 288, the statute providing for reception of an illegitimate into the father's family "and otherwise treating it as if it were a legitimate child" (p. 116), the quoted requirement was held to be met by evidence showing that the father often visited the child, contributed continuously to its support, had a paternal affection for it and acted towards it as a father would act towards a legitimate child. In an earlier case (*In re Jessup*, 81 Cal. 408, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594) it was held that "public acknowledgment" requires that the father should have held the child out to his relatives, friends, acquaintances and the world as his child. The majority opinion put stress on the danger of fraudulent claims of heirship, and pointed out that while Jessup protected the mother by providing for the child for a few years, and to a very limited number of persons spoke of him as his boy, he kept him out of the circle of his own association, did not visit him after he was two years old, and when visited by the boy later made the stays brief, making him only one present, a five-dollar watch.

"In his intercourse with his own family, he denied his relationship to the boy, and with those most intimately connected with him in his business relations, and who, by reason of such connection, acquired some knowledge of what he was doing, he never admitted or communicated that he was doing anything more than 'putting up' for the boy." (p. 433.)

Cyc. thus states the rule, mainly deduced apparently from the Iowa decisions:

"While one may by his acts be held to have sufficiently recognized a child to legitimate it, loose acts of occasional recognition, or an oc-

casional apparent recognition during the first years of the child's life at the home of its foster parents have been held insufficient." (5 Cyc. 633.)

The trial court in deciding the case observed, among other things:

"These visits were of short duration, a few days at a time. William Ellis never spoke or wrote directly to plaintiff as his own son. To several witnesses, however, he openly acknowledged his parentage. . . . One fact is noticeable, that out of the great number of witnesses herein, old friends, acquaintances and relatives of William Ellis, not one witness testified that William Ellis ever denied his parentage of plaintiff. . . . The community generally believed him to be the father and this sentiment he must have known, yet he said no word to clear himself of the charge; when for the sake of his wife and their children he naturally might have done so. His admissions of parentage were not many but, considering the opportunities of the witnesses to meet William Ellis and the delicacy of the subject, his conduct generally, and the fact that he really was the father of plaintiff, it must be held that he generally and notoriously recognized plaintiff as his own son."

The plaintiff invokes the rule that we can not interfere with the result reached by the trial court upon consideration of conflicting competent evidence, twelve of the long list of witnesses having testified orally, and calls attention to *McLean v. McLean*, 92 Kan. 326, 140 Pac. 847, where it was held that recognition is a question of fact, and where it was said in the opinion, speaking of paternity and recognition:

"These are questions of fact for the determination of the jury under proper instructions as to what constitutes a general and notorious recognition of the relation of father and son on the part of the father." (p. 329.)

Again:

"It is only for us to determine whether there was sufficient evidence to sustain their verdict and to justify the approval thereof by the court." (p. 331.)

It has also been ruled that when there is some evidence fairly supporting the conclusion of the trial court the result will not be disturbed, although apparently against the weight of the evidence. (*Cheney v. Hovey*, 56 Kan. 637, 44 Pac. 605.) When, however, the question is presented on appeal without oral testimony, and practically as it was in the court below, the conclusion of the trial court does not relieve us of exercising our own judgment. (*Mathewson v. Campbell*, 91 Kan. 625, 138 Pac. 637.) It has also been held that when all of the

evidence as to the controverted points is in writing it may be examined independently of the prior adjudication of the trial court. (*Bartels v. School District,* 89 Kan. 233, 237, 131 Pac. 579.)

Upon the question of recognition, and especially upon the affirmative of this question, almost the entire evidence was by deposition, said to constitute 328 typewritten pages. Under these circumstances the question of general and notorious recognition becomes one proper to be reviewed and determined by this court.

In a geographical sense there was neither general nor open recognition in Indiana or in Kansas during the entire residence in either of those states, with the exception of the admission to one intimate friend in Indiana. While the acts and declarations of the decedent upon his visits to the old neighborhood amounted to a recognition, such recognition appears to have been restricted to a meager number of old neighbors and associates and not to have been by any means as open and widespread as his acquaintance in the vicinity. Having, a few months after the birth of the plaintiff, married a cousin of his mother, and having resided out of the state for a generation of time, yet his wife and children claimed to be without knowledge of the plaintiff's paternity. It is significant that the intimate business acquaintances of the decedent in Kansas had never heard of such a claim, and that William Ellis never at any time, by any communication, provision or present, expressed to the plaintiff any sort of care, solicitude or recognition.

Laying aside all definitions and taking the words "general" and "notorious" in their natural signification, it is quite plain that there was no such recognition in Indiana or in Kansas, and that while the reputation of paternity was general in the old neighborhood in Kentucky its recognition was not open and notorious nor sufficiently general to meet statutory requirements.

The right of such unfortunate persons to inherit at all is a matter of the humaneness of modern legislation, and while, when the facts justify, the right is to be upheld regardless of the regrettable consequences to others concerned, still when a man at the close of a long life leaves a wife and children and

something for a rainy day, such family and such competency are not to be shadowed and depleted by one claiming sonship and heirship unless established with that satisfactory clearness intended by the legislature as evidenced by its language chosen to prescribe the degree of proof required.

Such required showing was not made, and the judgment is reversed with directions to enter judgment for the defendants.

WEST, J. (dissenting from the first syllabus and corresponding portion of the opinion) : To my mind we are going beyond our province in reviewing the volume of conflicting evidence in this, a fact case pure and simple.

Twelve of the witnesses gave their testimony orally. One of these was the plaintiff, whose "strong resemblance" to the decedent was remarked by the trial court. Another was the widow of William Ellis, and two others were his sons.

The rule that the testimony should be reviewed when all documentary should not be enlarged.

I am authorized to say that Mr. Justice MARSHALL concurs in this dissent.