No. 23,870.

Mrs. B. A. Linn, as Guardian of the Person and Estate of David Blanton, a feeble-minded person, *Appellee*, v. William T. Blanton, *Appellant*.

SYLLABUS BY THE COURT.

1. Action to Set Aside Deed—*Father to Son—Undue Influence.* The evidence to support a judgment setting aside a conveyance of land from father to son examined and held insufficient to support a finding of undue influence on the part of the son or the son's agents.

2. Same—*Evidence Required to Prove Undue Influence.* Before a conveyance of land to a son by a father, conceded to have mental capacity to make a contract, deed, or gift, will be set aside for undue influence it must clearly appear that at the time the conveyance was made this influence was exercised to such an extent as to deprive the grantor of his free agency and to substitute for his will the will of another.

3. SAME—*Deed from Father to Son—Oral Promise of Care and Maintenance—Good Consideration.* An oral promise by a son "to keep and care for his father during the rest of his lifetime" is a lawful consideration for a deed from the father to the son, and when the son's oral obligation is neither disputed nor breached, such deed may not be set aside by a court of equity, in the absence of undue influence, fraud or other illegality.

Appeal from Morris district court; ROSWELL L. KING, judge. Opinion filed July 8, 1922. Reversed.

*Harry E. Snyder,* of Council Grove, *Bennett R. Wheeler, S. M. Brewster,* and *John L. Hunt,* all of Topeka, for the appellant.

*Walter M. Doggett,* of Council Grove, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to set aside a deed conveying land from father to son.

The plaintiff's petition alleged undue influence and duress on the part of the son and his agents, operating upon the father. It recited:

"The said defendant hired and persuaded certain men, viz.: Henry Chandler, Warren Russell, J. B. Lamb, and others whose names are unknown to this plaintiff, to persuade and help defendant and persuade and coerce said David Blanton to sign and execute an instrument of writing. . . .

"That said defendant and said men above named did in the month of December, 1920, and while said David Blanton was in a weak and feeble state of mind and body, use undue influence and duress to persuade and force said David Blanton to sign and execute said instrument of writing or said deed.
. . . .

"That for several weeks just preceding the 27th day of December, 1921, said defendant and said men intimidated, nagged at, argued with and worried said David Blanton."

Issues were joined; and in the plaintiff's opening statement the following admission was made:

"Now, the plaintiff is not claiming that the old man was insane. The plaintiff is claiming that the old man was enfeebled in mind and that he was very much subject to the influence of William as any weak, any feeble, sick old father would be and especially—

"The Court: You mean you don't claim he was so mentally feeble that he was not—did not have the capacity to make a contract?
. . . . . . . . . . . .

"[Counsel for plaintiff.] . . . Judge, we are not claiming the old gentleman didn't have the capacity to make the deed at the time he made it, but

we do claim that he made this deed on account of his feeble condition and being persuaded, coerced and intimidated by these men, and we do—

"[Counsel for defendant] Do you admit he had the capacity to make the deed at the time he made it?"

"[Counsel for plaintiff] Yes."

In the cross-examination of a witness touching the grantor's mental capacity, plaintiff's counsel made an objection, and the court ruled:

"I hardly see how his mental incapacity to make a contract is in this case. It is in the record here that it is not claimed by the plaintiff that he was at the time this deed was made, and I am going to accept that for the purpose of this case.

"[Counsel for defendant] Well, with that view of it we don't care to cross-examine, but they have been presenting testimony that they—

"The Court: I take the plaintiff at their word that they didn't claim that."

The trial court made findings of fact, the most significant of which are the following:

"10. At the time of making said deed, David Blanton was 85 years old, though weak in body and mind, had just recovered from an attack of pneumonia from which he was not expected to survive, also crippled from a paralytic stroke suffered in 1918 and greatly bereaved from the recent death of his wife had sufficient mental capacity to make a contract or gift disposing of his property.

"11. Defendant, William Blanton, when on the witness stand was asked two or three questions by the court in regard to the consideration of the deed in question and in the answer to said questions, he in substance stated that he was to keep and take care of his father for the balance of his life time. Said questions by the court and the defendant's answers to the same are not shown or given in the reporter's transcript of the evidence in the case to show that as consideration for said deed, the defendant agreed to care for and keep his father for his life time, and I find that said promise by the defendant was and is the sole and only consideration for said deed.

"12. There is no evidence to show that at the time the deed in question was executed Evan Adam, Dr. Woodmansee or J. B. Lamb used or exercised any undue influence or control over David Blanton and by which he was induced to execute said deed. I find the fact to be that shortly prior to the execution of said deed, to-wit the day before said deed was executed, the defendant by undue influence and control exercised over his father, induced him to execute said deed and that he for some time prior thereto, and thru his agent and friends of his father used undue influence over his father and thereby leading him to execute said deed. That the act of David Blanton in the execution of said deed was not his voluntary and willing act. He executed said deed because of the continual nagging, argument, persuasion, pressure of

William Blanton and his agents and because of which in his weakened and feeble condition he could not resist.

. . . . . . . . . . . . .

"CONCLUSIONS OF LAW.

"1. In the making of the deed in question and as a part of the same as a consideration for said deed, William Blanton promised and agreed to keep and care for his father, David Blanton, during the rest of his lifetime.

"2. The act of David Blanton in executing the deed in question was not his free and voluntary act. He was unduly influenced to execute the same by William Blanton, his agents and friends.

"3. That the deed in question was wrongfully obtained and that the same should be set aside and held for naught."

Pursuant thereto, judgment was entered for plaintiff and the deed was set aside.

Defendant's principal contentions on appeal are that the adverse part of finding No. 12 was not supported by the evidence, and that the evidence did not justify the second and third conclusions of law nor the judgment entered pursuant thereto.

We begin our task of verifying the accuracy of these contentions with the plaintiff's admission of the father's mental capacity, and with the trial court's findings 10, 11, and the first part of finding 12, which are favorable to defendant—the father's conceded mental capacity, the court's recital of the unreported testimony of the son showing the consideration for the conveyance, and the court's exoneration of Adam, Doctor Woodmansee and Lamb from the charge of undue influence. The next part of finding No. 12 is "that the day before said deed was executed the son by undue influence and control exercised over his father induced him to execute said deed." Defendant says that this finding has no support in the evidence, and after a searching perusal of the defendant's abstract of 87 pages, the accuracy of which is not challenged, we are constrained to hold that this contention is correct. Neither the day before the deed was executed nor at any other time shown by the record presented to us did the son himself exert any undue influence over his father, nor any influence except of the most commendable sort—his long-continued, filial attention to his father and mother in the growing infirmities of their old age, even to the neglect of his own family and his private business. Indeed this is in accord with the trial court's finding No. 5:

"5. . . . Since May, 1918, it has been necessary at all times for someone to live with and take care of David Blanton, and while she lived, his wife.

The work of taking care of the father and mother since May, 1918, has been divided between the four children, but because of the fact that John and James lived on the Pacific coast the major portion fell on William and Mrs. Linn, and as between these two, the major portion fell on William. William Blanton lived with his father and mother in Dunlap for about a year prior to the execution of the deed in question, and during that period of time with the help of a nurse who was constantly present, took care of his father and mother."

But finding No. 12 is also to the effect that the defendant "thru his agent and friends of his father used undue influence over his father and thereby leading him to execute the deed. . . . He executed the deed because of the continual nagging, argument, persuasion, pressure of William Blanton and his agents."

Since we have seen that William did not directly and by his own conduct exercise undue influence, and the trial court found that neither Adam, Woodmansee, nor Lamb, exercised any such influence, we must carefully look for evidence which may support the finding of undue influence on the part of some agent or agents of the son.

The land was conveyed on December 27, 1920. Some time later, the defendant's sister, Mrs. B. A. Linn, who resided on a farm at some distance, and his two brothers, who had long resided on the Pacific coast, learned about this transaction; and thereafter, on February 19, 1921, the father commenced this action to set aside the deed. Some days later, a somewhat informal inquiry into Blanton's mental capacity was conducted at the residence of Mrs. Linn, following which she was appointed guardian for her father; and pursuant thereto she was substituted as plaintiff. The father's deposition, notwithstanding the probate court's adjudication of his feeble-mindedness, was taken in plaintiff's behalf. He deposed that some months before the deed was made, Mr. Lamb, a neighbor, said to him:

"Well he said the other boys had gone and they didn't care anything about me and he thought the best thing I could do was to deed the land to William."

Mr. Lamb denied this:

"Q. Had you ever asked the old man to make a deed to William Blanton? A. I never did approach the old gentleman to make Bill or anyone else a deed to that properties, no time."

The trial court apparently disbelieved the above-quoted portion of the father's testimony, and did believe Lamb's denial of it. (Finding No. 12.)

Linn v. Blanton.

Other portions of the father's deposition read:

"Q. Did anybody talk to you about that land last December?   A. I don't know as they did.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Did anybody else talk to you about deeding the land to William? A. Oh yes, quite a number of men talked to me about deeding it to William.

"Q. Who else talked to you about it?   A. Why, Warren Russell and Mr. —I can't recall his name now.

"Q. What did Warren Russell say to you about it?   A. He just wanted to know if I had deeded the land to William.   I told him 'no.'

"Q. You told him 'no'?   What did he say then, if anything?   A. He didn't say anything much.

"Q. Now to refresh your memory, I will ask you if Mr. Henry Chandler spoke to you about the affair?   A. Yes, that's the name I couldn't think of.

"Q. What did he say about it?   A. Well, sir, he said a good deal; he said a good deal.   I couldn't quote, I couldn't quote the man the way he talked.

.   .   .   .

"Q. About how long a time did he talk to you about it?   A. About an hour, I guess.   .

"Q. To refresh your memory, I will ask you if Tom Barber said anything to you about it.   A. Oh yes, Tom Barber talked a good deal—talked a good deal.   He stayed there at my house and he thought I ought to deed William the farm and he said I ought not to kick on taking care of it and he thought William would.

.   .   .   .   .   .   .   .   .   .   .

"Q. Did they say anything about William being the only one who cared anything for you?   A. Yes, he said that William was here and these other boys wasn't here and they didn't care for me.

"Q. Did you believe what these men told you?   A. Well, they kept nagging me and nagging me and I did believe it.

"Q. Did you want William to have that land?   A. No, sir.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. Well, why did you sign that deed?   A. I signed it by over-persuasion.

.   .   .   .   .   .   .   .   .   .   .

"Q. Why didn't you refuse to sign it?   A. I didn't think about it.   I didn't think about it.   I signed the deed— signed the deed to get rid of them.

.   .   .   .   .   .   .   .   .   .   .

"Q. When did you first decide that you didn't want to make this deed to William after it was done?   A. Well, I never in my life until it was made and then I regretted that I had made it, very much.   I never intended to give William a deed to the land and—

"Q. Didn't you know this was a deed the day you were making it?   A. It was supposed to be a deed.

.   .   .   .   .   .   .   .   .   .   .

"Q. Then John Lamb didn't influence you to deed the land?   A. He just talked to me about it and he thought I better do it.

Linn v. Blanton.

"Q. Deed the farm to William? A. Yes, sir.

"Q. And you only had that one conversation? A. Just one that I remember.

"Q. And you just had one conversation with Warren Russell? A. That is all that I remember.

"Q. And you just had one with Chandler? A. That is all that I remember.

"Q. They didn't any of these three men persuade you to sign this deed, you just talked to them about it? A. They just nagged me all over, one man to-day and another one to-morrow.

"Q. I thought you said you just had one conversation with each one? A. They did nag me to sign the deed.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Did anyone talk to you to change your mind about it? A. No, sir.

"Q. You just changed your mind yourself? A. Yes. Oh, I believe Mrs. Linn she said that I oughtn't to have done it. Since that time—since that time I have always regretted that I ever made the deed.

"Q. Then in your conversation with Mrs. Linn she told you you oughtn't to have done it because of the other children? A. Yes, because of the other children might come in and waive—want some of the proceeds of that land.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Did these men bother you or worry you? A. No, no, he didn't worry me at all. I just about—to tell you the truth about it, I intended to give the land to somebody.

"Q. Did you intend to divide it between your children? A. Yes, I wanted to divide it betwixt the children. I told William that I wanted it divided betwixt the children.

"Q. That morning down there you didn't tell these three men, Doctor Woodmansee, John Lamb and Evan Adam you didn't want to sign that deed? A. No, I didn't say anything about it."

This testimony, being in deposition form, is addressed to our independent consideration and we are not required to defer to the credence given to it by the trial court as we necessarily must do when the testimony is presented by witnesses in open court. (*Record v. Ellis,* 97 Kan. 754, 760, 761, 156 Pac. 712; *Farney v. Hauser,* 109 Kan. 75, syl. ¶ 7, 198 Pac. 178.) But even giving this testimony all due credence, does it show that Warren Russell, Henry Chandler and Tom Barber so greatly overbore the free agency of David Blanton as to coerce and dominate him, thus substituting their will for the free will of the grantor? Holding the plaintiff to the concession of her counsel as the trial court had intended to do—that Blanton had mental capacity to make the deed, and the trial court's ruling that it would "take the plaintiff at their word as to that," we do not think it establishes undue influence. Russell "didn't say anything much"; and Chandler and Barber each talked to him on only one

occasion that Blanton could recall. At most it shows that these neighbors urged him to do the handsome thing by the son who, at the sacrifice of his private affairs and at the necessary neglect of his wife and children, had served his parents so long and so well. To constitute undue influence so as to justify setting aside a deed it must be proved that at and about the time of the execution there was an influence bearing upon the will of the grantor so potent as to destroy his free agency and to substitute therefor the will of another. In *Smith v. McHenry,* ante, p. 659, it was said:

"A presumption of undue influence arises more readily with respect to the execution of a deed or contract than of a will. (*Ginter v. Ginter,* 79 Kan. 721, 744, 101 Pac. 634, 643.) But in either case in order for the evidence to be sufficient to warrant setting aside the instrument upon that ground it must show that a real consent was lacking. 'The undue influence for which a will or deed will be annulled must be such as, that the party making it has no free will, but stands *in vinculis.*' (*Conley v. Nailor,* 118 U. S. 127, 134.) 'In order to render a deed void it must operate to deprive the grantor of his free agency, by substituting for his will that of another. It does not, therefore, consist in mere gratitude for kindness, affection, or esteem, where a conveyance is induced, . . . nor in a mere desire by the conveyance to gratify the wishes of another, if the free agency of the grantor is not impaired, nor even in suggestions, entreaties, and importunities, short of exactions overpowering the grantor's volition.' (8 R. C. L. 1032.)"

Here there may have been argument, persuasion, suggestion and entreaty, if David Blanton told the truth; his friends "nagged" him to the extent to which he deposed; but none of this occurred at or about the time the deed was executed, and while Blanton says he made the deed "to get rid of them," they were not acting upon his will at the time he requested his son to call the notary, nor when the notary came to prepare the deed and take his acknowledgment. Neither Russell, Chandler nor Barber, the men said to have "nagged" him, were present when the deed was executed, and there is no evidence that at that time the will of the grantor was subordinate to the will of those who had urged him to convey the land to his son William.

We note the testimony that some time before the deed was executed, William having been advised that his father had said he would give the land to him, said: "I would give $100 to anybody who would get him to do it." There was nothing wrong or discreditable to William in this. Both his parents had led him to expect that in some way and at some time the land would be his. His mother,

Linn v. Blanton.

in his father's presence, had declared that the land should not be sold to a stranger, that it was to go to William. Even the sister, who is here as the substituted plaintiff, had gone with the father to Mr. Lamb to get him to write to the sons in Washington and California to suggest to them the propriety of letting William have this land at a mere fraction of its value so that he might continue to care for his parents with full assurance of compensation for his services rendered and to be rendered to them. Quite naturally then William said, and may have said repeatedly, that he would give $100 if his father would make him a deed, so that the end he had been led to expect would be consummated while his father was alive and competent to do so.

The other evidence has all been carefully examined, but space forbids further quotation. It does not show undue influence. Very much of it was persuasively to the contrary. The defendant has no quarrel with the finding that the consideration for the deed was his promise and agreement "to keep and care for his father, David Blanton, during the rest of his lifetime." That is a perfectly lawful consideration, notwithstanding it was not incorporated in the deed. (*Stout v. Ennis,* 28 Kan. 706; *Weld v. Weld,* 71 Kan. 622, 624, 81 Pac. 183.)

Moreover, and pursuant thereto, the defendant bought a house to be moved to the land in order that he might adequately care for and keep his father. Since there was neither undue influence, fraud nor other illegality, there was no ground for equitable interference with the deed or the contract on which the deed was founded.

The other matters urged upon our attention need no consideration. The evidence did not show any fiduciary relation existing between father and son. The son had been the father's tenant for thirty years, and their business relations were merely those of landlord and tenant. Consequently the rule announced in *Smith v. Smith,* 84 Kan. 242, 114 Pac. 245, has no application.

Reversed and remanded with directions to enter judgment for defendant.