The opinion of the court was delivered by
The parties to the action are two groups of fire insurance companies who have been represented in certain instances by common agents known as mixed agencies. The form of the action was injunction to prevent defendants from accomplishing a conspiracy. The nature of the conspiracy was to oust plaintiffs from mixed agencies and monopolize the insurance business of the mixed agencies in the territory in which plaintiffs and defendants operate. The method of carrying out the conspiracy was to coerce mixed agencies to resign representation of plaintiffs and to represent defendants only. Plaintiffs were defeated, and appeal.
The stage setting which plaintiffs arranged for the conspiracy was this: In the year 1879 a voluntary association was formed to promote reforms in underwriting. The association was called "The Union," and it is still in existence. The members of the union are officers and managers of fire insurance companies. Membership is personal, not representative. The union has by-laws, rules and regulations for its own government and for the accomplishment of its objects. The governing body is called the governing committee, which is composed of nine members. The activities of the union embrace questions relating to rates, commissions to agents, rules of *Page 453 
practice, and in general matters of common interest in the insurance field, subject, however, to the insurance laws and regulations of the various states. The means of communicating "legislation" of the union and disseminating information to members is by publication of confidential bulletins. The union membership includes officers and managers of about 200 insurance companies, including the oldest, richest and best known companies in the United States. Defendants' managers are members. Because of their weight and influence due to past success, the companies affiliated with the union have a dominating position in the insurance world and do eighty-five per cent of the premium business in territory in which they operate. This territory embraces eighteen Middle states of the United States, including Kansas. Insurance companies have no direct contact with the source of premium supply. This contact is made through agents, who procure customers, issue policies and collect premiums. By means of service to the insurance-purchasing public, a reliable, active agent builds up a business which has an income and sale value to him, and marks him as a desirable representative. He becomes agent for different companies, and employment of the same agent by union companies and by nonaffiliating companies produces a mixed agency. Companies supervise their agencies through special representatives called field men. These men are experts who, through capability and experience, are not only able to render technical engineering assistance and advice to local agents, but are also able to engender confidence and good will, and so to exercise personal influence over agents. Plaintiffs for the most part are small companies in respect to capital and volume of business. They lack the prestige of the powerful defendants, do no national advertising, are unable to compete with the service rendered by union companies, and do but fifteen per cent of the insurance business in union territory.
The action of the conspiracy was this: The union field men were confederately launched against the mixed agencies, and the plaintiffs were to be routed by threats of the field men that if the agencies were not cleared union by a fixed date, union policies would be canceled, service to union patrons would be inhibited, union expirations would be transferred, and the union business would be diverted to some other agent. The denouement
was terror to the mixed agencies, and if they did not clear union, loss of business, good will and clientele; destruction of the profitable relation between *Page 454 
plaintiffs and their agents, and pecuniary and irreparable injury to plaintiffs; and monopoly by defendants of the business of the mixed agencies.
Defendants threw a different picture on the screen. One subject which plaintiffs failed to mention in their petition was that their managers belong to an association organized about the year 1910, called the Western Insurance Bureau, which was patterned after the union in respect to membership, object, character of organization, and method of operation. The bureau has a membership of about 150, and its governing body is called the executive committee. There was no allegation in the petition that the union is an organization existing contrary to law, or morals, or public policy.
On the basis of experience, defendants determined that agents should be compensated by allowing them a percentage of premiums collected, and established a rate. The commission fixed was fifteen per cent, which was acceptable to agents, and was regarded as a fair adjustment of this item of expense, chargeable to cost of insurance to patrons. Afterward, but before the bureau was organized, the union companies were obliged, in order to meet competition for business, to adopt a graded scale of commissions. The scale was fifteen per cent, twenty per cent and twenty-five per cent, based on classification of risks. A competitive weapon of the smaller and less influential bureau companies, particularly since rate-making has been taken over by the states, has been payment of larger commissions to agents, who, like insurance companies, engage in the business of insurance for gain. Use of this weapon has been a disturbing influence upon the business of insurance, similar to rate-cutting, and leads to chaos.
In 1911 the union and the bureau entered into an agreement known as the conference agreement, the purpose of which was to stabilize the business of insurance by adopting safer and more conservative methods, especially with reference to expense of conducting the business. That meant especially with reference to commissions, although there were opportunities for concord in respect to other subjects. The agreement provided that in mixed agencies the union graded scale should be paid, and that neither union nor bureau companies should enter clear agencies of the other. Union companies paid the graded scale in both mixed and clear union agencies, but the bureau companies paid higher commissions in their clear agencies, the differential amounting to 33 1/3 *Page 455 
per cent of the union scale upon preferred classes, which constitute the business most desired.
The success of any company depends not only on the alertness and energy, but also on the loyalty of its agents. The relation is fiduciary in respect to the authority of supreme importance which agents possess; but besides that, in mixed agencies the agent must be confidently depended on to distribute business impartially in respect to both quantity and quality. The settled conviction of defendants' managers, long entertained, is that in the hot strife for business there are those who are willing to tempt, and that thirty pieces of silver have power to allure. Under the influence of higher pay for the same service, an agent's service will in fact be different, whether consciously or unconsciously, in quality, degree and manifestation. In any event, mixed agencies in which some companies are willing to pay excessive commissions require more supervision than clear agencies, and separation is sound business policy.
In 1923 the conference agreement was abrogated. Several causes contributed to its collapse, but in the opinion of union managers the differential between union and bureau scales was the primary cause. Abrogation of the conference agreement meant separation, and left union companies and bureau companies free to pursue their divergent policies. Ninety days' notice was necessary before abrogation could become effective. Before the period commenced to run, the bureau gave notice that its scale of commissions would be put into effect in mixed agencies, and this was of course an invitation to the mixed agencies to clear bureau. Of necessity, abrogation became an immediately accepted fact, and plaintiffs actively propagated their seductive influence in the mixed agencies. Some of the defendants acted promptly. Efforts to prevent strife demoralizing to the business failed, and other of the defendants sent their field men to the mixed agencies. The agents were put to their election whether they would represent defendants, and were given time in which to decide. There was no threat of cancellation of policies. Expirations were not taken away. If a union agent went bureau, he took his expirations with him, and his authority to indorse policies, and the like, continued.
The term of agency is at will, and, believing that a principal has the right to say who its own agent shall be, defendants were inclined to view the action as an appeal to equity, to force them to *Page 456 
keep as their agents those who are also agents of plaintiffs, and whom plaintiffs insist on tempting to disloyalty in the common service by offer of more money than defendants, with due regard to themselves, the agents and the public, are willing to pay.
The district court returned findings of fact and conclusions of law, which follow:
 "FINDINGS OF FACT.
"1. The general managers of the defendant companies are members of a voluntary organization known as the union, organized in 1879, and the general managers of the plaintiff companies are members of an organization of a similar character, organized in 1910.
"2. That the plaintiffs and defendants as a part of their representation have contracted for the services of common agents, known as mixed agents, who represent both plaintiff and defendant companies.
"3. That from about October 1, 1923, until the time of the filing of the petition in this case, except for an interval of thirty days, many of the defendant companies in the state of Kansas were pursuing a policy of employing agents who would represent exclusive union companies, thus doing away with the so-called mixed companies.
"4. That in the carrying out of such policy the field men of some of the defendant companies stated to such mixed agents that it would be necessary for them to elect as to whether they desired to thereafter represent union companies exclusively, or other companies paying or willing to pay a higher rate of commission for their services, or, generally speaking, bureau companies; that if such mixed agent elected to represent companies other than the defendants, the defendant companies would protect such agent's rights to expirations and the privilege of making indorsements on policies of insurance theretofore written by them; and that such mixed agents were generally unwilling to make such election, but the defendants' field representatives stated that it was necessary for them to do so, fixing various dates by which they were to exercise such choice.
"5. That some of the general managers of the defendant companies and some of the field representatives have discussed the policies of their respective companies with similar representatives of other defendant companies, but that in pursuing such policies the defendant companies acted individually.
"6. The defendants have not entered into a conspiracy or combination for the purpose of monopolizing the insurance business in such mixed agencies, or of ousting the plaintiff companies therefrom, or of maliciously injuring their business therein, or of intimidating or coercing the mixed agents into resigning the representation of the plaintiff companies.
"7. That the defendants have not combined to boycott the plaintiffs as charged in the petition.
"8. The cost incident to installing a new agent in the place of one who has resigned is from fifty to sixty dollars per agent. The evidence shows that in those mixed agencies where the agent resigned the representation of the plaintiff companies and elected to represent only union companies, the plaintiff companies have suffered a substantial loss, but the evidence does not *Page 457 
show the amount of the gain in business arising from those mixed agents who elected to clear bureau and represent only plaintiff companies, for which reason the court cannot determine whether there has been an aggregate loss or gain to the plaintiff companies resulting from the separation activities of the defendant companies.
 "CONCLUSIONS OF LAW.
"1. That the acts of the defendants do not constitute an unlawful conspiracy.
"2. Assuming that the evidence discloses a conspiracy or combination on the part of the defendants, the object of such combination was lawful, and the means employed to accomplish it were likewise legal.
"3. The acts of the defendant companies, as shown by the evidence, do not constitute either a primary or a secondary boycott.
"4. The defendants have not violated the antitrust laws of this state.
"5. The application for a permanent injunction should be denied, and judgment entered for the defendants for costs."
Plaintiffs contend the district court erred in its findings of fact. The contention that the findings of fact are erroneous is presented in disregard of a rule which Mr. Justice Marshall, speaking for the court in the case of State, ex rel., v.Telephone Co., 115 Kan. 236, 223 Pac. 771, said had been followed probably five hundred times. In one of plaintiff's briefs it is said:
"It is our intention and desire to bring the case before the court in its entirety, and we think unquestionably the court has power to set aside the findings of fact made by the trial court, substitute findings of fact requested by plaintiffs, and from a review of all the evidence, direct judgment for plaintiffs."
Upon this basis the merits of the case are argued to this court, in an effort to convince it that the charges contained in the petition were proved. The function of this court on appeal was stated in an opinion of the court delivered by Mr. Justice Kingman in 1864, which reads as follows:
"It is only errors apparent upon the record that this court takes cognizance of, and those are errors of law. We cannot retry the case upon its merits. In this case if we should come to a conclusion that the evidence, as we understand it, and the proper application of law might bring us to a different conclusion from that of the court below, it would be a retrial of the whole cause, not a review of alleged errors of law. In the former chancery practice this was a consistent course to pursue by appellate tribunals, because the evidence on which the chancellor acted was all reduced to writing, and the same facts in the same fulness of detail were presented to the revisory tribunal as were acted upon by the chancellor, but the code authorizes oral testimony in all cases. If it were then to allow an appeal and retrial of the cause upon the evidence as presented by a bill of exceptions, the appellate court would try the cause without the benefit of seeing the witness, of judging of his credibility *Page 458 
by his intelligence or his manner, which might show to the court below such evident bias as greatly to weaken his testimony. If the code allowed such a course the appellate court would be much more likely to commit error than to correct it." (Major v.Major, 2 Kan. 337, 339.)
When volume No. 100 of the Kansas reports was published, the court, speaking through Mr. Justice Dawson, relinquished hope that the time would ever come when it would not be necessary to restate this fundamental law governing appeals. In the opinion it was said:
"A petition for a rehearing filed herein discloses that its author does not understand the function of an appellate court. The petition chides us for incorporating part of plaintiffs' evidence in our opinion and omitting defendants evidence to the contrary. Our purpose in quoting part of the plaintiffs' evidence was to show that there was no merit in defendants' contention that the findings and judgment of the trail court were contrary to the evidence. On that point the defendants' evidence, although there was much of it, was of no consequence. The supreme court is not charged with the duty of ascertaining the facts. We do not see the witnesses; we do not know whom to believe. We cannot determine the probative weight of the evidence introduced pro and con in the trial court. We must accept as true the trial court's findings of fact when there is some tangible and competent evidence to support those findings." (Bruington v. Wagoner,100 Kan. 439, 164 Pac. 1057.)
Without any trace of weariness, the same justice formulated the following paragraph of the syllabus in the case of Farney v.Hauser, 109 Kan. 75, 198 Pac. 178, just as though it stated a new principle:
"Where there is substantial evidence to support a finding made by the trial court or jury, the supreme court adopts such finding as an ascertained fact although the record also contains evidence to the contrary; and the supreme court cannot independently undertake to determine the relative weight of the evidence, except in cases where the controlling evidence is documentary or by deposition; and this rule is the same whether the cause be in the nature of an action at law or a suit in equity." (¶ 7.)
The doctrine rests on constitutional grounds. In the case ofThe State, ex rel., v. Telephone Co., 115 Kan. 236,223 Pac. 771, the court said:
"We are, in effect, asked to try this case de novo. Under the constitution the jurisdiction of this court is appellate only, except in three specific instances. That jurisdiction cannot be extended so as to make this court try appealed cases de novo."
(p. 270.)
In support of this statement a number of cases were cited, among them those in which power of the legislature to extend jurisdiction to determine cases de novo on appeal was denied.
The last case in the last number of the advance sheets of the *Page 459 
Kansas reports issued at the time this is written contains the following:
"The district court is the fact-finding tribunal. Authority of this court is limited to correction of error, and it may not, in case of doubt, declare error in a conclusion of fact unless it has facilities for determining the fact which are equal to those possessed by the district court." (The State v. Rieman,118 Kan. 784, 785, 236 Pac. 641.)
Appellants say that when a portion of the testimony is in deposition or in writing, this court may substitute its judgment for that of the trial court, and cite two cases: Record v.Ellis, 97 Kan. 754, 156 Pac. 712, and Mathewson v. Campbell,91 Kan. 625, 138 Pac. 637. In Record v. Ellis the questions were paternity and open and notorious recognition of a child. Paternity and recognition were proved. All the evidence relating to character of recognition was contained in depositions taken in the state of Kentucky, where the child was born. In their brief the parties claiming open and notorious recognition conceded there was no evidence that such recognition occurred outside of Kentucky, and accounted for the fact. In that situation, a single issue, openness and notoriousness, was decisive of the case. The evidence relating to that issue being in deposition, this court had the same facilities for determining the matter that the trial court possessed. In the case of Mathewson v. Campbell the question related to the counting of challenged ballots. The ballots were brought here. The court said:
"In this case there was no oral evidence, and none that was conflicting. The legality of each ballot is to be determined solely by the markings on its face, and all that are in question are presented here just as they were in the district court." (Mathewson v. Campbell, 91 Kan. 625, 627, 138 Pac. 637.)
Plaintiffs say they established combinations and conspiracy "for the most part" by depositions. For the most part will not do. This court finds in the depositions testimony distinctly favorable to defendants, and other testimony which might or might not be unfavorable, depending on what other witnesses might say. Supplemented by oral evidence, these classes of testimony might furnish fair basis for a finding of no conspiracy. It was the district court's province to weigh the evidence and find the fact.
Plaintiffs say finding 4 is not as complete as it should be, findings 5, 6 and 7 are not findings of fact, and all but the first sentence of finding 8 is inaccurate and not material. These criticisms are made in an effort to show that the findings do not stand in this court's *Page 460 
way in making independent adjudication of the case on its merits. The criticisms did not occur to plaintiffs while the case was in the district court. The only objection to the findings presented to the district court in the motion for new trial and in the motion to vacate the findings was that the findings were contrary to the evidence. Nothing else is open to consideration here.
The petition contained the following charges as the basis for the relief prayed for:
"That the defendant companies have now entered into a combination, agreement and conspiracy for the purpose of attempting to monopolize the insurance business in the mixed agencies in union territory and to oust and eliminate the plaintiff companies from all mixed agencies in which the plaintiffs were represented, and to persuade the mixed agencies in said territory, by threats, intimidation, duress and coercion, to resign the representation of the plaintiffs in such mixed agencies and to represent only the defendant companies. . . .
"That said combination, agreement and conspiracy on the part of the defendants as herein set out has resulted and will continue to result in the creating and carrying out of restrictions in the lawful business relationship existing between the plaintiffs herein and the mixed insurance agencies of the state of Kansas, all of which is contrary to the laws of the state of Kansas, . . ."
Findings 6 and 7 are the court's response to these allegations of fact. Plaintiffs have not entered into conspiracy or combination, nor have they combined.
In plaintiffs' brief it is said:
"At the outset any rule of law applicable in cases of this kind requires that there shall first be shown the combination, or, as it is sometimes called, the concert of action. In view of this rule, it becomes incumbent upon the plaintiffs to take up in the first instance the facts and circumstances upon which the plaintiffs rely to show that there was in fact an agreement and concert of action on the part of the defendants."
The first statement is true. The second reveals the fundamental defect in the presentation of the appeal already discussed. The court is not concerned with how much evidence there may be in favor of plaintiffs. Its sole interest lies in whether there was any substantial evidence to support the findings against plaintiffs. The following is illustrative:
The secretary of the union kept a minute book of the meetings of the governing committee. The writings were his own compilation, kept for his own personal use, and were never approved or adopted by the governing committee. The president of the union *Page 461 
testified he had never seen the secretary's record "until the other day," and was surprised to see how it was kept. In the record were expressions strongly relied on by plaintiffs to show that separation was made a union matter by adoption and propagation by the governing committee, and consequently that there was concert of action among defendants. The secretary himself explained the expressions, showing they were not open to the interpretation placed on them by plaintiffs, and testified the union had no separation rule, and had never taken any action with respect to separation. In September, 1924, when the governing committee was recommending dates upon which the fifteen-per-cent rule should be put into effect, the governing committee rejected a proposed resolution to submit to a regular meeting of the union, soon to occur, the question whether the union should assume jurisdiction of separation. This evidence alone would have sustained a finding that separation was not a union matter. In an opinion of the trial court, filed in connection with its findings of fact, the court said:
"Certain excerpts from the secretary's memoranda are well within the twilight zone of uncertainty as to their meaning, and might well be interpreted as evidencing an intention by the governing committee to regard separation as a union matter. As against such possible construction, all of the members of the governing committee have testified that such language related to the enforcement of the fifteen-per-cent rule in mixed agencies, and that separation was studiously regarded as not being a union but an individual company matter. The court was impressed with the high character and the apparent honesty of these witnesses."
Plaintiffs discuss this subject in their brief as follows:
"In the face of this testimony, taken from the very minutes of the secretary of the union, the union managers repeatedly insisted that separation was not a union matter. This testimony on their part is so obviously contrary to the actual facts that it surely cannot impress this court as being either frank or sincere evidence. Yet the trial court, `impressed with the high character and apparent honesty of these witnesses,' preferred to accept their testimony and cast aside the written minutes of their secretary, who was undoubtedly much more familiar with all of the circumstances than any other individual, and who made up his minutes when they were fresh in his mind, as an accurate and trustworthy account of the facts that they contained."
The cases of Major v. Major, Bruington v. Wagoner and Farneyv. Hauser dispose of this argument, and this court is bound to recognize it as an ascertained fact that conspiracy may not be predicated on activities of the governing committee.
Plaintiffs' contention is that individual separation by the companies *Page 462 
in haphazard fashion would not be effective, and consequently that direction and control of separation was centralized in the governing committee, which formulated the method of separation, and by establishing connection with the field men, applied the method to the mixed agencies. Therefore, when the governing committee is acquitted, the conspiracy charge is eviscerated.
The quoted portion of plaintiffs' brief is characteristic. Plaintiffs say the commission differential was brought into the case as a false issue to hide the gist of the action, that from a legal aspect it is of no importance, because one company may not complain of what another company pays its agents, that it is a small matter anyway, and that circumstances show conclusively union managers did not consider it a serious factor.
Union companies do not complain of what bureau companies pay their own agents. What they complain of is the corrupting influence of the differential upon common agents.
When the union was organized one of the articles of the compact was that —
"No member of the union shall pay or allow to be paid any agent on any class of fire, tornado and cyclone business a commission or compensation exceeding fifteen per cent of the net premium."
Later the union graded scale of commission — fifteen, twenty and twenty-five per cent — was adopted. These commissions were paid to clear union companies, but in mixed agencies the fifteen-per-cent rule was enforced. When the bureau was organized its rates of commission on the union classification were twenty, twenty-five and thirty per cent. The purpose and nature of the conference agreement between the union and the bureau is stated in the outline of the defense to the action appearing above. Throughout existence of the conference agreement the union paid its graded scale in both clear union and mixed agencies, while the bureau paid according to its own scale in its clear agencies. The union held a regular meeting in Montreal in September, 1923. At that meeting the governing committee made a report that the conference agreement was not satisfactory for stated reasons, among them the following:
"A differential in commission in any organization, or in either of two working in close agreement, is not conducive to the morale, and destroys confidence in each other."
Abrogation of the conference agreement confessedly precipitated a contest to hold the business flowing from the mixed agencies. The *Page 463 
bureau companies sent new agency contracts to its mixed agents, providing for payment of the bureau scale of commissions. The district court, in its opinion, stated the situation which then confronted the union companies, and their manner of meeting it, as follows:
"The differential in commissions was substantial, and amounted to an increase in commissions to the mixed agents of from 25 to 33 1/3 per cent, dependent upon the classification of risks. The defendants had the choice of four different methods of meeting the situation: One, to do nothing, but rely upon the fairness and integrity of the mixed agents to give them an impartial distribution of the business, both as to amount and preferred risks; second, to withdraw from mixed agencies at the sacrifice of their business and to the prejudice of mixed agents who might desire to represent them; third, to enforce the fifteen per cent commission in mixed agencies, which was viewed by most of the defendants as being equivalent to or worse than a withdrawal, for the reason that they were still represented by the mixed agent under the adverse condition of a much larger differential in commissions; and fourth, to withdraw conditionally from the mixed agency, i.e., by requiring such agents to elect whether they desired to continue to represent the higher commission paying companies or union companies. Naturally, they chose the latter."
In December, 1923, the insurance commissioner of this state undertook to compose conditions. He made an order requiring both union and bureau companies to pay the union graded scale in mixed agencies and to cease separation, and arranged for a hearing before a subcommittee of the National Association of Insurance Commissioners. An armistice was declared for thirty days, but the commissioner's efforts were unproductive of permanent results.
The National Association of Insurance Agents convened a meeting which was attended by union and bureau representatives, called the "trilateral conference." A committee of the association presented a statement expressing concern at the rupture of relations between the union and the bureau, and proposed a platform as an approach to common ground upon which all might stand. One plank of this platform reads as follows:
"We believe it is a bad practice for companies to pay or for agents to accept differential commissions in the same agency."
The union recommended a proposition to the conference. The introduction contains the following:
"The `joint conference agreement' so called, was a sincere attempt to fuse and coördinate two groups of companies in the middle western field which *Page 464 
held divergent views on this question [commissions to agents]. That effort, maintained most earnestly and painstakingly, at the expense of much time, attention and energy on both sides, for some eleven years, has broken down. It is in no derogation of either side to say that it is surprising that it lasted as long as it did, when it is considered that the point of divergence was a most lively and critical element of business competition; that is, the rate of compensation to the producers upon whose favors and dispensations the companies depend for their business."
The union recommended an association committed to a uniform scale of commissions, and made, among others, the following recommendations:
"We recommend and urge local agents to take the long view and regard the broad public-policy aspect, as well as their own permanent self-interest, by refusing to represent dissenting companies which seek to buy their favors for the time being by offering higher or greater commissions or allowances. . . ."
The bureau submitted a memorandum opposing a single organization paying a uniform scale of commissions, indicated that it did not propose to relinquish payment of its scale in mixed agencies, and, anticipating failure of the conference, made what amounted to a plain bid for mixed agencies to accept its favors.
Clarence A. Ludlum, vice president of the Home Insurance Company and manager of a group of companies whose premium volume ranks second in the United States, testified as follows:
"I was convinced by evidence other than direct proof that the provisions of the conference agreement were not being observed by the bureau with respect to uniform commissions in mixed agencies. I was convinced by the amount of business, or distribution of business, or general attitude of the local agents, that there were other inducements offered than was provided for by the conference agreement.
 . . . . . .
"I attribute the collapse of the conference agreement to the differential between the union and bureau scales of commission. . . .
"My experience with agents has been wide, and I have no doubt but that an inducement of 33 1/3 per cent more compensation to an agent for the same work is an active factor in determining what company will get the business. I believe it would be a dominant factor between two companies of the same size and offering approximately the same services. I would not consider it good policy to remain in an agency where the agent was subject to that temptation. The preference of our company is to be represented only in agencies where other companies are on the same basis respecting commissions as we are, and we are effecting that preference wherever we can bring it about. This principle is a fundamental conviction of my company. . . .
"I am certain that if, for instance, my company had been in an agency *Page 465 
in smaller towns for a number of years, and then a bureau company came in, the differential of commission would rob my company of its distribution of business in that agency. . . . I do believe as a general proposition it is poor business policy to remain with an agent who has companies that pay a high compensation for the same service at the same time. I wouldn't stay in a mixed agency whether the bureau was actually paying their scale or not, as long as their regular established scale had a higher rate of commission, and I believe it is a good business policy to separate in such agencies, whether there had been a conference agreement or not. The policy with regard to not staying in mixed agencies is substantially the same on the part of most of the union managers. . . .
"The one proposition in all the bureau proposals to which the union could not agree was their insistence upon the differential rates of commission."
Other union managers gave similar testimony.
Under the settled rules of appellate procedure the district court's findings draw to their support not only all evidence which might sustain them, but all inferences from the evidence which might sustain them. Under this rule the foregoing would furnish sound basis for the following conclusions: Instead of the commission differential being a false issue, it is the master key to the whole controversy; the charge of clouding issues should not be leveled against defendants; the district court's conclusion, that the differential is substantial and produced a condition adverse to defendants, was reasonable; the differential in its application to mixed agencies has a moral aspect which plaintiffs studiously ignore, and which might properly be considered as affecting their standing in a court of equity and good conscience; and that Ludlum and the other union managers were sincere. The result is, the court has followed what plaintiffs regard as the unmasking of defendants' conspiracy with interest; but the framers of the constitution omitted to clothe the court with power to do anything about it.
Plaintiffs contend the district court misconceived and misapplied the rules for detecting and identifying conspiracy. The record discloses an admirable exhibition of capability on the part of the district court to deal with facts, and the soundness of its method in respect to circumstantial evidence is indicated by the following excerpts from its opinion:
"Although it is not in evidence, probably most of the companies believed that separation was the inevitable result of the abrogation of the conference agreement. Accordingly, some companies proceeded immediately to separate, others more slowly, and some did nothing, but deferred action awaiting future development. *Page 466 
"A definite and expressed agreement is not necessary, nor are formal words, written or spoken, required to the entering into of a conspiracy. Neither is it essential that each conspirator shall take part in every act, as the conspiracy implies concert of action, and not participation in every detail of execution. . . .
"The evidence does not show which of the defendants, if any, entertained such intention of concerted action as contradistinguished from individual company action. Many of the managers of companies which were actively pressing separation in mixed agencies testified positively and without equivocation that the action taken by their companies was prompted solely by the necessities of a sound business policy as related to their individual companies, and that there was no understanding or agreement as to concerted action with other companies. The positive character of this testimony from these witnesses who principally direct the business policies of their respective companies largely destroys the weight and effect of the circumstantial evidence offered by plaintiffs relative to agreed concerted separation action, from which a contrary intention might otherwise be inferred."
In concluding its discussion of the conspiracy charge the court said:
"From my analysis of the evidence, viewed from all angles — the union itself, the individual companies, and their field representatives — I do not believe that the evidence establishes that the defendants have entered into a conspiracy or combination as charged."
There is abundant evidence in the record to warrant this conclusion, which finds definite expression in the duly formulated findings of fact.
Plaintiffs argue that the means employed by defendants to accomplish the object of their combination operated as a secondary boycott, and constituted a violation of the Kansas antitrust act forbidding combinations to carry out restrictions in the full and free pursuit of business authorized by law. With Hamlet out, the play cannot proceed. There was no combination.
The district court, as it was privileged to do, undertook to demonstrate that plaintiffs were not entitled to the relief prayed for, conceding there was combination. This court's consideration of the case must end with its determination that the findings of fact are sustained by evidence. Anything it might say respecting the very interesting subjects canvassed by the district court and discussed by counsel would be dictum.
The judgment of the district court is affirmed.
MARSHALL, J., not sitting.
 *Page 416