No. 22,268.

Roy Smith, *Appellant,* v. William P. Smith et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. Descents and Distributions—*Illegitimate Child—Inheritance.* Under the statute of descents and distributions, an illegitimate child who has been duly recognized by his father may inherit through the father from his collateral kindred the same as a child born in lawful wedlock.

2. Same — *Illegitimate · Child — Paternity — Recognition by Father.* In this action the paternity of an illegitimate child was established beyond question, but the sufficiency of the recognition by his father to enable him to inherit from and through the father was contested. Upon the evidence, it is held that the recognition of the father was so general and notorious as to meet the requirements of the statute.

Appeal from Douglas district court; Charles A. Smart, judge. Opinion filed July 5, 1919. Reversed.

*R. M. Hamer, H. E. Ganse,* and *W. W. Parker,* all of Emporia, for the appellant.

*John J. Riling,* and *E. T. Riling,* both of Lawrence, *C. C. Crabbe, E. W. Johnson, H. H. Crabbe,* all of London, Ohio, and *J. E. Bowman,* of Springfield, Ohio, for the appellees.

Smith v. Smith.

The opinion of the court was delivered by

JOHNSTON, C. J.: This case was brought for the partition of real property, and the principal questions presented for determination are, first, whether Roy Smith, the illegitimate son of Robert Smith, was so recognized by his father as to be entitled to inherit from him; and second, whether, under the statute, an illegitimate child may inherit from the collateral kindred of his father.

There is little of any controversy as to the paternity of the plaintiff. At the trial counsel for defendant, in answer to a question asked by the court, stated that the evidence in the case would persuade the court that Robert Smith was in fact the father of the plaintiff, but it was and is strongly contended that the recognition of paternity by the father was not general and notorious.. About forty years ago, the plaintiff was born near London, Ohio. His father, Robert Smith, resided with his parents, Jacob and Amanda Smith, near London. Plaintiff's mother, Felecia Phillips, lived with her parents, who were neighbors of the Smith family. Robert and Felecia were lovers, frequently associating together in courtship, and were engaged to be married. Robert had suffered a stroke of some kind, and for that reason their marriage was postponed. Sometime about 1879 the plaintiff was born, and he was given his father's name. About two or three years after the birth of plaintiff Robert suffered another stroke and died suddenly. Shortly after the death of Robert his parents took the plaintiff into their home, treating him and speaking of him as a grandson. In his will Jacob Smith left land and money to plaintiff, designating him as "Roy Smith, son of Felecia Phillips, who lives with me." Property was also left him by his grandmother. A guardian of the person and estate of plaintiff was appointed in 1895, and in the record of the appointment by the court it is recited that he was sixteen years old and the son of Robert Smith. The trial court gave judgment for the defendant, but as substantially all of the testimony is in depositions, this court must examine the evidence and determine the questions of fact for itself. Although the paternity of the plaintiff was shown beyond question, that is not sufficient to establish his right of inheritance. There was

no proof that the relationship was acknowledged in writing, and to inherit it must therefore be shown that the recognition of the father was general and notorious. (Gen. Stat. 1915, § 3845.)   The proof of recognition is not as full and satisfactory as might be desired, but it is the view of the court that, under the circumstances, it was sufficient to meet the requirements of the statute.   The brief time which plaintiff's father lived and the long period that has elapsed since the occurrences sought to be shown made it somewhat difficult to prove recognition.   In *McLean v. McLean,* 92 Kan. 326, 140 Pac. 847, where a like question was under consideration, it was said:

"The circumstances of each case are, of course, different, and the gist of the decisions is that the extent of recognition necessary to meet the statutory requirements depends in some measure upon the circumstances of each case. Where frequent opportunities for such recognition are presented for a long period more is required than where such opportunities are less in number or in a more limited time." (p. 330.)

Many witnesses stated that it was a matter of general report in the neighborhood, and among the people with whom Robert mingled, that he was the father of plaintiff.  A witness named Rea, testified that he knew the father and mother of plaintiff, and that on one occasion when he met Robert Smith on the highway near the Phillips home, he had the baby in his arms, and that he talked with him for a time, and during the conversation he spoke of the baby as his boy.  He took the baby back to the Phillips home and returned to assist the witness in driving cattle.  Reason Castle, a servant on the Smith farm, stated that he knew Robert well, and that while riding home from town in a wagon he heard Robert say to another person in the wagon that the child was his baby, and he wanted to take care of him.  The same witness said that he was living at Smith's after Robert's death, and that Jacob Smith directed him to hitch up the team, saying he was going to bring Robert's son to his home to be taken care of by his grandmother, and that he could take care of him at home cheaper than anywhere else.  That evening the boy was brought to the Smith home, and Jacob afterwards spoke of him as his little grandson.  Another witness, Scott Wheeler, who lived in the neighborhood, and was well acquainted with Robert Smith and Felecia Phillips, said that he had a conversation with Robert

after the baby was born, during the time that it was common report in the community that Robert was the father of the child, in which Robert stated that the baby was his son, and he would marry the mother, only his father would not let him do so. This witness testified that he was present when the baby was brought to Smith's home, and that the defendant, who was present, was greatly displeased at the act, and Jacob remarked, "Will is mad because I brought Bob's boy here." And afterwards the defendant remarked to the witness, "Well, they had to bring that damned boy of Bob's here." John Phillips, a brother of Felecia, testified that Robert Smith continued to visit at the Phillips home after the baby was born, and that he would hold the baby in his arms and call him his boy. He also testified that in the Phillips home there was talk to the effect that Robert and Felecia were to be married, but that Robert had a stroke before the baby was born and the marriage was therefore postponed. Another witness, Lloyd Wheeler, testified that he had seen Robert and Felecia together in the town of London many times after the birth of the baby and when it was generally said that Robert was the father of plaintiff. The circumstances tend to show that Robert must have made a like acknowledgment to his father and mother, thereby inducing them to take the boy into their home and to speak of and treat him as Robert's son. If Robert had denied the relationship, it is quite unlikely that the grandparents would have taken into their family one reputed to be Robert's son, and whom they believed was the bastard son of another. Letters were written by Robert's mother to Felecia, the import of which was that she recognized that plaintiff was Robert's son, and that she had a duty to perform in caring for him. In her letters she attempted to allay any fear of Felecia that Roy would not be well cared for. She asked for his exact age, saying "I will have it written in the Bible. I do not know how old he was when Bobby died or I could tell." There was evidence given in behalf of the defendant, some of which tended to discredit a part of the plaintiff's evidence, but most of it was of a negative character, to the effect that the witnesses knew Robert Smith and had not heard of his recognition of the plaintiff.

The proof necessary to establish the recognition required by statute depends, as we have seen, upon the circumstances of

èach case. In *McLean v. McLean,* supra, where the paternity
of the child was contested, the recognition was sustained, al-
though there was no more proof of it than there was in the
present case. In relation to the acknowledgment necessary to
meet the requirements of the statute, it has been said:

"While such recognition must have been general and notorious, and
the proof thereof must be sufficient to convince the mind, it is not neces-
sary that it should have been universal or made known to all or to a
majority of the community, but it is sufficient where the proof shows that
the father frankly admitted the relationship when there was occasion for
him to speak and made no attempt to conceal the same, although it also
appears that there are many of his friends, relatives, and acquaintances,
who have no knowledge thereof," etc. (7 C. J. 949.)

Much reliance is placed by defendant on the case of *Record
v. Ellis,* 97 Kan. 754, 156 Pac. 712, and that authority does tend
to sustain the theory of the defendant. In that case, however,
the evidence of recognition was not so persuasive and con-
vincing as in the present one. There the alleged father lived
about forty years after the child was born, ten years of that
time was spent in Indiana, where he was married, and there
was no proof of acknowledgment of paternity in Indiana, ex-
cept in one instance. Then he removed to and lived in Kansas
more than twenty-eight years, and there was no acknowledg-
ment there, and even his wife and sons had never even heard
of the imputation that he was the father of Record. There was
testimony of recognition in Kentucky, which was very slight,
and in view of the fact that he lived so long after the birth of
the child, and of the opportunities for recognition, the proof of
it was manifestly insufficient. Here the circumstances were
materially different. The sickness of Robert Smith and the
brief time he lived after the birth of plaintiff gave little oppor-
tunity for recognition. However, considerable testimony was
offered of open acknowledgment of fatherhood. Each witness
referred to different occasions and to separate statements and
acts of recognition. They gave testimony of unequivocal state-
ments and acts of recognition. There was no question as to the
paternity, as there has been in some of the cited cases. Recog-
nition may be established by acts, as well as by words, and the
taking of Felecia Phillips to London many times after plaintiff
was born, where their neighbors and friends congregated, and
when it was generally understood that he was the father of

plaintiff, tends to establish recognition. Although there may be proof in denial of recognition, it is enough if that offered convinces and satisfies the triers of the facts that it existed. While the testimony is not strong, it is deemed sufficient to show such a general and notorious recognition of the fatherhood of Robert Smith as to meet the statutory requirements.

Having determined that the plaintiff may inherit from his putative father, there remains the question whether he is entitled to inherit, through the father, from his grandfather or other collateral kindred. The solution of the question must be found in the statute. Under the common law an illegitimate child was deemed to be outside the line of inheritance. To overcome and remedy this injustice, the legislature has specifically conferred the right of inheritance upon illegitimate children, and to effectuate the purpose the statute should be given a liberal interpretation. In sections 3844 and 3845 of the General Statutes of 1915 it is provided that—

"Illegitimate children inherit from the mother, and the mother from the children."  (§ 3844.)

"They shall also inherit from the father whenever they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing."  (§ 3845.)

In section 3846 it is provided:

"Under such circumstances, if the recognition of relationship has been mutual the father may inherit from his illegitimate children."  (§ 3846.)

Section 3841 is as follows:

"Subject to the rights and charges hereinbefore contemplated, the remaining estate of which the decedent died seized shall, in the absence of other arrangements by will, descend in equal shares to his children surviving him, and the living issue, if any, of prior deceased children; but such issue shall collectively inherit only that share to which their parent would have been entitled had he been living."  (§ 3841.)

Section 3843 provides that—

"If one of his parents be dead, the whole of the estate shall go to the surviving parent; and if both parents be dead, it shall be disposed of in the same manner as if they, or either of them, had outlived the intestate and died in the possession and ownership of the portion thus falling to their share, or to either of them, and so on through ascending ancestors and their issue."  (§ 3843.)

It is contended that, as the right depends upon the statute, and as section 3845 expressly provides that an illegitimate

child shall inherit from his father, it evidences a legislative intention not to put such child in the line of inheritance, the same as children born in wedlock, but to limit the right to inherit from the father alone. The other sections indicate a purpose to take away the disqualification resulting from illegitimacy, and to clothe the illegitimate child with heirship and place him in the line of succession with other children of an intestate. It is provided that the illegitimate child shall inherit from his mother, and in similar language the right to inherit from his father is given him. Then follows the provision that the mother shall inherit from the illegitimate child, and where there is the required recognition, that the father also shall inherit from such child. Then, as showing that the relationship when duly established by recognition is not limited to father and child, it is provided that in the matter of inheritance the mother and her heirs shall take preference over the *father and his heirs*.

The legislature contemplated a relationship of succession, not only with the father, but also with the heirs of the father. We have no doubt, from the language used, that the legislature intended to give an illegitimate child the status of a general heir in the matter of the descent and distribution of the property of an intestate, and that the plaintiff is entitled to inherit from his father's father.

The judgment will therefore be reversed, and the cause will be remanded with directions to make partition of the property involved, in accordance with the opinion herein.

BURCH, J. (dissenting) : The court makes its own findings of fact, because it is said the evidence is substantially all in depositions. After disposing of the subject of paternity, which, while not expressly admitted, was not in fact contested at the trial, the opinion of the court takes up the subject of open and notorious recognition, and recites the evidence. The recital begins with the neighborhood gossip, "general report," later called "common report," not of recognition, but of paternity. How this tongue-wagging bound Robert is not stated. Dovetailed into the narrative, indeed forming the bulk of it, is evidence which has no semblance of relation to open and notorious recognition by Robert, the one person who, under the statute, could confer heirship. No rule of law is referred to, binding

Robert by talk in the Phillips home when it is not pretended he was there; or binding him by conversations between others after he was dead; or binding him by open and notorious recognition of the child as his by others long after he was dead. Assuming the court based its finding on this evidence, or pains would not have been taken to detail it, the decision is erroneous.

Leaving out of account the evidence just discussed, there is little left in the case. There is testimony of the old negro who worked for the Smiths, who says that when Robert was joked about the baby, in a wagon on the road, he admitted paternity. Presumably, the place of admission—on the road—gave it the quality of notoriety. A witness, however, from the Smith home—Robert's brother—testified that after the birth of the child, Robert said he supposed he would get the benefit of it, but it was not his. This was oral testimony, given at the trial, which the trial court believed. Three other witnesses (not including a former saloon keeper), one of them a member of the same social set as Robert, testified that when rumor and gossip were brought home to Robert, he repudiated paternity. This evidence is as credible as any that appears in the record, and should be considered as bearing directly, not on the subject of paternity, but on the subject of open and notorious recognition. It is not discussed in the opinion of the court.

There is testimony of Joe Rea, sixty years old, who hangs around a livery stable, sleeping there part of the time, and whose reputation for truth and veracity was impeached. He told of another highway recognition, which, however, he had never mentioned to any one, and which the evidence shows was a pure fabrication. Felecia's own brother traced the movements of the members of the Phillips family. The family, including Felecia, left the county before the child was born. After Robert's death, Felecia married, left the child with her parents, and went to live twelve miles south of Columbus, where she still lives. Later, the parents returned to another part of the county, bringing the child with them. Consequently, Felecia never returned to the county after the child was born, either before or after Robert's death. This well-established fact nullifies the testimony of the witness who glibly told of seeing Robert and Felecia together in the town of

London many times, not only before, but after the birth of the child.

There is left a private conversation with Scott Wheeler, recognition of the child in the privacy of the Phillips home, and speculation by the court that Robert must have admitted paternity to his parents. It is said Robert must have admitted paternity to his parents, because, after he died, they would not have taken into their home the bastard child of another. It will be recalled that the old negro servant said nothing about any admissions made about the Smith home, and the only living member of the family testified that Robert denied the child. Consequently, the reasonable inference is, the parents became satisfied Robert was the father, and after his death undertook to discharge what they regarded as his unperformed duty, by recognizing the child themselves. However this may be, an admission of paternity which must be derived by inference, and which, if made, was a private confession to parents, is not, to my mind, very notorious.

The statute may be unjust to bastards, but the legislature fixed the policy of this state with reference to the subject, and the court is not authorized to substitute a different policy by its method of dealing with evidence. Recognition must be in writing, or must be open and notorious. Notorious has here its common, everyday, well-understood signification: "Generally known and talked of; well, widely, or commonly known; forming a part of common knowledge; . . . universally recognized." (Webster's New International Dictionary, title, notorious.) If the putative father should not live long enough to make recognition, both open and notorious, the bastard cannot inherit. It must not be forgotten that what the statute deals with is, not notoriety of paternity, but notoriety of recognition of the child by the father. The strength of testimony relating to paternity is immaterial. Paternity may be placed beyond question by the verdict of a jury in a bastardy proceeding, but the fact has no tendency to prove open and notorious recognition.

In my opinion, the judgment of the district court should be affirmed.