### JAMES et al. v. JAMES. (No. 6982.)

(Court of Civil Appeals of Texas. San Antonio. June 13, 1923. Rehearing Denied June 29, 1923.)

1. **Marriage ⊕20(1) — Secret agreement and clandestine cohabitation insufficient to constitute common-law marriage.**

Marriage being as much a matter of status as of contract, a mere secret agreement to marry, stealthily followed by clandestine cohabitation, is insufficient to constitute a common-law marriage.

2. **Appeal and error ⊕1001(1)—Jury's finding as to father's recognition of child as his own not disturbed where supported by material evidence.**

The jury's finding that a father recognized a child as his own before and after his marriage to its mother, thereby legitimating it, as provided by Rev. St. art. 2472, will not be disturbed where supported by material evidence.

3. **Bastards ⊕100 — Incapable of inheriting from any source at common law.**

At common law an illegitimate child is incapable of inheriting from any source.

4. **Bastards ⊕10—Statutes authorizing legitimation liberally construed.**

Statutes authorizing legitimation of bastards, being enacted to abrogate the harsh rule of the common law, and to permit them to inherit, should be liberally construed to effectuate such purpose, though every provision should be given effect, as in any act, in the absence of irreconcilable conflict between them.

5. **Bastards ⊕101—On legitimation by marriage and recognition, may inherit from paternal grandparents, as well as from father.**

Under Rev. St. art. 2472, a bastard whose father marries the mother and recognizes the child as his own is legitimated for all purposes, and inherits not only the father's estate at the time of his death, but that of the father's collateral or lineal kin, such as his parents, surviving him, just as a bastard not so legitimated may inherit collaterally, as well as directly, from his mother, under article 2473.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by Charles Robert James, by guardian, against William Henry James and oth-

⊕For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ers. Judgment for plaintiff, and defendants appeal. Affirmed.

Collins & Houston, of Dallas, for appellants.

Harris & Hogan and Don. A. Bliss, all of San Antonio, for appellee.

SMITH, J. In January, 1911, Elijah C. James, an 18 year old boy, and Bea Lawless, a 15 year old girl, mutually agreed to become husband and wife, and thereupon cohabited together. At this time they were living with their respective parents near Somerset, in Bexar county, and continued to do so after making this agreement. A few months later the girl, realizing that she had become pregnant, besought the boy to enter into formal marriage with her, and, while the latter agreed to do so, he persuaded her to go to her sister in Houston, promising to follow and marry her there. In pursuance of this understanding the girl went to Houston, but the boy did not follow her, as he had promised. On October 3, 1911, the girl gave birth to a son, whom she named Charles Robert James, and as soon thereafter as she was able to travel returned to San Antonio. There the boy met her at a rooming house, and, after a conference between them, at which it seems the girl's mother, sister, and uncle were present, they were formally married by a justice of the peace. At this time young James was under indictment for seduction based on the girl's condition. There is evidence, too, that he married the girl with some reluctance, and perhaps under some degree of duress. About a week after the marriage the couple began living together, but a few weeks later the young husband left his home one morning, telling his wife that he was going to work. She never saw him again, nor heard directly from him. During the next three or four months he wrote his parents, once from Tampico, Mexico, once from Atlanta, Ga., and perhaps another time from some point in Mississippi. In his letters from Tampico and Atlanta he wrote under an assumed name, stating in the one that he had been robbed, in the other that he was ill, and in a hospital, and in each asking for money. His parents in both instances sent him remittances, which were finally returned to them "uncalled for." The jury found, in effect, that, after these communications, the boy was never heard of or from again. Subsequently Bea Lawless was divorced from James, and married Owen Ray, who joins her in this suit. The court charged the jury under art. 5707, R. S., that any person absenting himself for seven years successively shall be presumed to be dead, unless proof to the contrary is shown, and on this charge the jury found that young James was dead, and that he died prior to the decease of his parents, both of whom subsequently died. The jury further found that he was the father of the child born to Bea Lawless, and that after his formal marriage to the latter he "recognized" the child as his own.

Summarized, the facts are that Elijah James and Bea Lawless agreed to become husband and wife, and cohabited together; that as a result thereof Charles Robert James was born to the woman, whom Elijah thereafter legally married; that Elijah was the father of the child, whom he recognized as his own, subsequent to the formal marriage with the mother.

Elijah James was one of several children of Jesse C. and Amanda James, who, in community, owned certain lands lying across the line between Bexar and Atascosa counties. According to the jury's findings, Jesse and Amanda James were both living at the time of the death of their son, Elijah. Subsequent to the latter's death the parents died, intestate, and while possessed of the land mentioned. When the matter of the division of the elder James' estate arose, and partition thereof awarded, Charles Robert James, the son of Bea Lawless James, and the derelict, Elijah, brought this action, through his mother, claiming that portion of his grandparents' estate which would have gone to his father had he been alive. Counsel have very ably presented these primary questions of law:

First. Was there a common-law marriage between Elijah James and Bea Lawless?

Second. Did their formal marriage after the birth of Charles Robert legitimatize the latter, so that, upon the death of his father, Elijah, he succeeded to all the inheritable rights of his said father? And does he, therefore, take that portion of his paternal grandparents' estate which his father, if he had survived them, would have taken?

The trial court submitted the issue of common-law marriage substantially in this language:

"Is it true that on or about January 5, 1911, Bea Lawless and Elijah C. James, by words of present import, mutually agreed to be husband and wife, and in pursuance of such agreement thereafter cohabited, and the result of such cohabitation was the subsequent birth of Charles Robert James?"

The jury answered the question in the affirmative. Bea Lawless was the only witness who testified to the agreement of the parties to be husband and wife, and to the fact of cohabitation. While her testimony as to the agreement was somewhat meager, yet it was sufficient to warrant the jury's finding on that point. Both the evidence and the findings are sufficient to establish the facts of the secret agreement, the subsequent cohabitation, and the birth, as well as paternity, of the child, Charles Robert. But with reference to the issue of common-law marriage neither the findings nor the evidence establish more than this group of bare facts. We do not think these facts, or the finding

of the jury thereon, are sufficient to establish a common-law marriage under the laws of this state. The evidence is that the new relation thus secretly assumed by Elijah James and Bea Lawless was not permitted to make the slightest impression upon their outward lives. They were but children at the time, living with and at the homes of their respective parents, and so they continued to live until a month before the child was born, when the girl went to her sister in Houston. If the event meant any more to them than secret cohabitation, it was not disclosed by their attitude towards the public, or towards each other in public. Their modes, manner, and separate places of living, their associations, their friendships, went on without change or interruption, except as they made secret opportunities to exploit their new relation by cohabiting together. So far as the record shows they made and had no plans or hopes or aspirations in common for themselves or for their future. They did not live together; they told no one of their secret agreement, which they kept profoundly locked in their own breasts. They did not by word or act hold themselves out to the public, or to their families or friends, as being husband and wife, or as being anything more to each other than they had ever been. The sole evidence in their lives of any marital relation was the secret agreement, coupled with clandestine cohabitation; to their families, neighbors, friends, and acquaintances there was no evidence whatsoever of the new relation.

[1] Marriage is as much a matter of status as it is of contract, and a mutual agreement to become husband and wife does not amount to marriage unless and until it brings the parties into the normal relation of those who have joined their lives together irrevocably, and for as long as they both shall live. A mere secret agreement, stealthily followed by clandestine cohabitation, is not all that is necessary in this country to constitute a legal, or the true, marriage state. Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011; Berger v. Kirby, 105 Tex. 611, 153 S. W. 1130, 51 L. R. A. (N. S.) 182; Schwingle v. Keifer (Tex. Civ. App.) 135 S. W. 194, affirmed in 105 Tex. 609, 153 S. W. 1132. The definition of a common-law marriage propounded as an issue to the jury by the court in this case substantially was:

"Did Bea Lawless and Elijah James, by words of present import, mutually agree to be husband and wife, and in pursuance of such agreement thereafter cohabit?"

The definition of the trial court in Berger v. Kirby Case, approved by the Supreme Court, was:

"A common-law marriage exists when a man and woman enter into an agreement to become husband and wife, and in pursuance of such agreement do live together and cohabit as husband and wife and hold each other out to the public as husband and wife."

And in the Grigsby v. Reib Case Chief Justice Brown said:

"Marriage is not a contract, but a status created by mutual consent of one man and one woman. The method by which it is solemnized, or entered into, may be by proceedings prescribed by statute, or by mutual agreement with cohabitation, but, however contracted, having the same elements and producing the status of husband and wife. The sole difference which can legally exist is in the method of expressing consent, and the only particular in which a marriage as at common law can differ from the statutory method is the absence of license and the ceremony. The cohabitation must be professedly as husband and wife, and public, so that by their conduct towards each other they may be known as husband and wife. Such marriages may be equally the consummation of a mutual affection which will produce a home and family that will contribute to good society, to free and just government and to the support of christianity—to the common weal. It would be sacrilegious to apply the designation 'a civil contract' to such a marriage. It is that and more; a status ordained by God, the foundation and support of good government, and absolutely necessary to the purity and preservation of good society. When the 'wedding day' of the parent ceases to be revered by the offspring, there will be a weakening of the family ties and a lowering of the standard of marriage and home."

Under these authorities it appears to be quite obvious that the record in this case wholly fails to show a common-law marriage between Bea Lawless and Elijah James.

[2] There being no common-law marriage between the parties, it follows that Charles Robert James could not inherit his father's portion of the estate of the latter's parents, unless he could lawfully do so by reason of the subsequent legal marriage of his parents and the recognition by Elijah James of the paternity of the child. There is no question but that the parents were legally married shortly after the birth of the child, and there was evidence of the fact, and the jury so found, that before and after the marriage ceremony Elijah James recognized the child as his own. In this way the case is clearly brought within the terms of article 2472, providing for the legitimation of children born out of wedlock. Appellant vigorously challenges the sufficiency of the evidence upon the question of recognition. We see no occasion, however, to discuss this evidence at length, as counsel has done so ably, and we will dispose of the question by simply saying there was material evidence of the fact, and, as the jury has resolved the issue against appellant, we will not disturb that finding.

[3-5] It is contended by appellant that the provision in article 2472 that, by the belated marriage of the parents, and recogni-

tion of the child by the father, the child "shall thereby be legitimated and made capable of inheriting his (the father's) estate," the child is not endowed with all the rights of legitimate issue, but his right to inherit is limited to property vested in his father at the time of the latter's death; that the right to inherit does not extend beyond his father's immediate estate, or to estates which his father, if living, would inherit. In other words, it is contended that the acts of legitimation did not in this case create in the child the right (existing in his father, had he been alive) to inherit the estate of his paternal grandfather. The question has not been decided by any of the courts of this state, so far as our search of the authorities has gone, notwithstanding the present statute has been in force for three-quarters of a century.

At common law an illegitimate child is incapable of inheriting from any source, and his condition under the laws of this and other states is the same as it was under the common law except as it has been ameliorated by statute. Until 1840 we were in this state subject to the Spanish law, under which illegitimate children inherited generally. In 1840 we adopted the common law of England (Acts 1840, p. 3), and in the same year, and at the same session, the Congress passed an act regulating the descent and distribution of intestates' estates (Acts 1840, 132), in which in one section (article 2473) it was provided that "bastards shall be capable of inheriting or of transmitting inheritance on part of their mother," etc., and in another section (article 2472) it was provided that, "where a man having by a woman a child or children, shall afterwards intermarry with such woman, such child or children, if recognized by him, shall thereby be legitimated. * * *" By this act the Congress expressly repudiated the harsh rule of the common law in so far as it was applied to illegitimates who should be legitimated through the process prescribed in the act, and it is not "supposed that the Congress of 1840, who had lived under the humane laws of Spain with respect to illegitimate children, intended any less liberal provisions with respect to this class of unfortunates." Berry v. Powell, 101 Tex. 55, 104 S. W. 1044, 16 Ann. Cas. 986. It will be supposed, on the contrary, that the Congress intended to give that class every right vouchsafed them under the Spanish law, which included the right to inherit generally on the father's as well as the mother's side.

In 1848 (Acts 2d Leg. c. 103) the Legislature re-enacted the descent and distribution statute, with certain modifications. The provision of the act of 1840 with reference to the rights of bastards to take from their mothers was amended and made more certain in order to meet a decision of the United States Supreme Court (Stevenson's Heirs v. Sullivant, 5 Wheat. 617, 5 L. Ed. 70) construing the Virginia statute upon the same subject, from which our statute of 1840 was borrowed. The purpose of the amendment of 1848 was to make more certain the provision giving bastards the right to inherit not only directly from, but collaterally through, their mothers. Berry v. Powell, supra. This immediate question, of the right to inherit from and through the mother, is not involved in this appeal, but we have thus briefly discussed it because of its indirect bearing upon the question directly involved.

The provision of the act of 1840, for legitimation of his illegitimate children by the father, was repealed in 1842, but was reenacted in 1848, and made to read as follows:

"Where a man, having by a woman a child or children, shall afterward intermarry with such woman, such child or children, if recognized by him, shall thereby be legitimated *and made capable of inheriting his estate.* * * *"

The words italicized were added by the act of 1848 to the previously repealed act of 1840, and the whole constitutes the present article 2472, R. S. It is of course entirely clear that the act of 1840 had the effect of fully legitimating the class therein designated, giving those coming within the class the status of children born in lawful wedlock. But it is now contended by appellants that the clause added to the provision by the act of 1848, "and made capable of inheriting his [the father's] estate," are words of limitation, and modify the word "legitimated," and that by this limitation the inheritable right of the legitimated child is restricted to such estate as his father may possess at the time of his decease; that under this restriction the child may not inherit from his father's collateral or lineal kin, or, in this case, his father's parents, who survived the father.

It is this contention that makes all the difficulties in the case; but we have concluded, nevertheless, that it should be overruled. It was clearly the intention to provide for full legitimation, and this intention was expressed in terms. It is presumed that, if the Legislature had intended to authorize only partial legitimation, or legitimation for a limited purpose, it would have expressed that intention affirmatively, and in plain terms, rather than by implication. The statutes authorizing legitimation were enacted for the humane purpose of abrogating the harsh rule of the common law with reference to illegitimate children, "and to confer upon them a capacity for inheritance more in accordance with the principles of natural justice," and for that reason the statutes should be liberally construed so as to effectuate the obvious purpose. Berry v. Powell, supra. If this rule of construction is kept in mind, as it should be, the courts will not permit the added clause in article 2472, "and made cap-

able of inheriting his [the father's] estate," to limit the antecedent and positive provision which bestows full legitimation upon the class designated.

It is of course the duty of the courts to give effect to every provision embraced in article 2472, as in any act, in the absence of irreconcilable conflict between some of its provisions. By the added clause it was of course intended to give to those legitimated the capacity to inherit directly from their fathers, as expressly provided. As this result would have followed the plain provision unqualifiedly legitimating the class mentioned, it is difficult to discover the purpose of the added clause, and we do not here essay the task. It is sufficient, we think, to point out that that clause, while expressly affirming the capacity to take directly from the father does not affirmatively limit the inheritable capacity to that purpose, or prohibit the heir thus legitimated from taking from all other sources open to legal heirs, to whose level the act in terms raises those theretofore deemed illegitimate. We think the rule of liberal construction requires that we give full effect to the provision which directly legitimates those in the class designated, and to hold that the added clause was not intended to take away any part of that which had just been fully bestowed upon those who are at most but innocent victims of the folly of others.

It will be observed by reference to the statutes that the bastard, whether legitimated or not, is recognized as the heir of the mother, both directly and collaterally; but, as to the father, the relation of the bastard who has not been legitimated, as provided in article 2472, is the same as it was at common law, and he cannot inherit from or through the father, either directly or generally. This distinction exists universally, and the reason of it is obvious—the proof of the paternity of a child is uncertain. If the paternity were as certainly ascertainable as the maternity, there would be no reason for the distinction, which in such case would not prevail.

It is wisely provided by the law that a child born in wedlock is presumed to have been begotten by the husband of its mother; its paternity is thus rendered certain as a matter of law. In such case the child is the recipient of all the rights conferred upon legal heirs by the statute of descent and distribution. And in article 2472 the law goes further, and provides a means of establishing the paternity of a child born out of wedlock; where, in such case, the father, after the birth of the child, intermarries with its mother, and recognizes the child as his own, he thus renders certain the paternity of the child, which would otherwise remain uncertain. In this way the law's demand is satisfied; the paternity of the child is rendered certain, thus removing the reason of the rule denying to the bastard the right to inherit from or through his father, as he does from and through his mother.

When the Legislature provided this means of establishing the paternity of the illbegotten child, and provided for its legitimation in terms, can it be reasonably contended that that body intended to materially curtail the rights of the child thus legitimated by limiting its inheritable capacity so that it could take from his father directly, but not through him generally? If the interpolated clause in article 2472, "and made capable of inheriting his estate," can be given no other effect than this, then it occurs to us that it is so repugnant to the positive provision that the child or children designated shall be "legitimated" it should be ignored, and the positive provision enforced, so as to give effect to the obvious purpose of the article as a whole. If it is true that the added clause serves to raise some doubt as to its purpose, or that, when given a strained or highly technical application, it could be construed as a limitation upon the capacity of the beneficiary of the whole provision to inherit generally, as one begotten in lawful wedlock, yet the rule of liberal construction of the statute nevertheless prohibits giving it this effect. The Supreme Court of Georgia did in fact give that effect to a similar limitation in the Georgia statute. Hicks v. Smith, 94 Ga. 809, 22 S. E. 153. But, according to the opinion in that case, this character of statute is strictly construed by the courts of that state, while in Texas they are liberally construed; and in that case the court was construing a statute "ligitimating" the issue designated, which statute had superseded one theretofore enacted, and thereby repealed, by the terms of which the issue was "fully legitimated." The court held that the word "fully" must have been intentionally omitted, and that, as the act was in derogation of the common law, and must be strictly construed, the added clause, "and capable of inheriting from his father," would be given the effect of excluding the capacity of the legitimated child to inherit other than directly from his father.

As we have said, the courts of this state have not passed upon the question under consideration. Appellant suggests that in the case of Berry v. Powell, to which we have often adverted in this opinion, Chief Justice Gaines "shows how absurd it would be to contend that the legitimated bastard has the same rights on the father's side as he has on the mother's side." In discussing the question of whether or not under article 2473 bastards were capable of inheriting from their collateral kindred on their mother's side, Judge Gaines held that that statute should be given that effect, but said, in that connection:

"If they [the Legislature] had said merely that 'bastards shall be capable of inheriting from their mothers and of transmitting estates,' it would have admitted of a question whether the act did not allow them only to inherit from their mothers and their mothers to inherit from them."

At first blush this expression, coming from such a source, might be regarded by analogy as casting a doubt upon the effect of article 2472 to give full power of inheritance to legitimated children. But this doubt is dispelled by analysis of the two articles. Article 2473 nowhere provides that the bastards therein provided for shall be "legitimated," whereas article 2473 expressly provides that the illegitimates therein dealt with "shall thereby be legitimated." We think, on the whole, that the reasoning in the opinion in the Berry v. Powell Case supports the conclusions we have reached. This may be said also of the cases of Smith v. Smith, 105 Kan. 294, 182 Pac. 538, and Davenport v. Davenport, 116 La. 1009, 41 South. 240, 114 Am. St. Rep. 575.

We are of the opinion, then, that, when Elijah James intermarried with Bea Lawless, and recognized the previously born child as his own, the child was thereby legitimated for all purposes, and was entitled to take the estate of which his paternal grandparents were seized at the time of their decease.

The judgment is affirmed.

### On Motion for Rehearing.

It was said in the original opinion that the original of the present article 2472, enacted in 1840, was repealed by the Congress in 1842. We made this statement, not by consulting the acts of 1842, but upon the unchallenged statement to that effect in appellants' brief, and upon an annotation to that effect in Vernon's 1914 Civil Statutes, under article 2472. Appellants now call our attention to the fact that the act was not in fact repealed after its original adoption in 1840, and assumes responsibility for the error into which they were led by the annotation in question. So the fact is that the original act was never repealed, although, as stated in the original opinion, it was amended in 1848 by adding the words, "and made capable of inheriting his (the father's) estate." While it may be true, as appellant contends, that this course in the history of article 2472 tends to emphasize and support appellants' theory that the added clause was intended as a limitation upon the inheritable capacity of the legitimated child, yet we do not think the possible intent to restrict the capacity should be construed to control the previous unqualified purpose to fully "legitimate" the offspring for whose benefit the statute was enacted.

The motion for rehearing will be overruled.