

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable Benton Coopwood
District Attorney
Travis County
Austin, Texas

Dear Mr. Coopwood:

Opinion No. 0-7529

Re: Validity of a ceremonial mar-
riage performed by "proxy"
under a power of attorney.

We have your letter requesting our legal opinion upon the above-titled subject matter, such letter being in full as follows:

"As you are aware, by Article 602 of the Penal Code of Texas, wife desertion constitutes an offense and in prosecutions for such offense, a valid marriage must be proved (28 Tex. Jur. 740) and it is the duty of this office to prosecute such cases in Travis County. It will be greatly appreciated if your department will give me its opinion concerning the validity of a ceremonial marriage performed by 'proxy' under a power of attorney, based upon the following state of facts:

"An adult male citizen of Texas, designated 'A,' while in the armed forces of the United States, became engaged to a young woman resident of Texas, designated 'B,' with the intention of becoming married shortly thereafter; but prior to the date of the contemplated marriage, 'A' was shipped overseas into the Pacific theater of war. By letter 'A' proposed to his fiance, 'B,' that they become married by proxy, and upon her consent thereto, 'A' executed a power of attorney authorizing 'C,' a male friend and a resident of Texas, to apply for and obtain a marriage license authorizing 'A' and 'B' to marry, and in 'A's' place and stead to give and accept the vows of marriage at a marriage ceremony with 'B' to be performed in Texas. The power of attorney was properly executed and acknowledged by 'A' before a legal officer of the Army, who was duly authorized to take such acknowledgment.

"Upon receipt of the power of attorney, 'C,' the agent designated therein, together with the young woman, 'B,' applied for and obtained from a county clerk of

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable Benton Coopwood, page 2

Texas a marriage license in the name of 'A' and 'B.' Thereafter a marriage ceremony was performed by a justice of the peace of Texas, at which 'C,' in behalf of his principal, 'A,' exchanged marriage vows with 'B,' and the justice of the peace pronounced 'A' and 'B' to be husband and wife. The ceremony was performed in the presence of witnesses, who properly attested to the marriage, and the marriage license was duly completed by the justice of the peace, certifying to the performance of the marriage ceremony between 'A' and 'B' and thereafter returned to and recorded by the county clerk who issued the license.

"Immediately following the ceremony and continuously thereafter, 'B' assumed and used the name of 'A' and publicly held herself out to be his wife; and immediately upon receipt of the news of the performance of such ceremony 'A' publicly announced his marriage to 'B' by means of the proxy designated in the power of attorney, and formally notified his finance officer of such marriage and claimed the subsistence and quarters allowance granted by the government to married officers; and thereafter each month until 'A's' discharge from the service, he caused monthly allotment checks to be mailed to 'B,' as 'A's' wife.

"Upon the return of 'A' from overseas, he and 'B' openly lived together in Texas, cohabited, and continued to announce themselves as being husband and wife. As a result of the union of this couple, a child has been born, which was christened and duly registered as the legitimate child of 'A' and 'B.'

"At the time of the execution of the power of attorney and at the time of the marriage ceremony, both 'A' and 'B' were white adults, over twenty-one years of age, and were not prohibited by any of the provisions of Article 4607 from intermarriage.

"It will be greatly appreciated if you will give me your opinion as to the validity of the marriage ceremony performed as hereinabove set forth, as the precise question does not appear to have been decided in any of the reported decisions of the Texas courts, and the question is one of general public importance because of the large number of similar ceremonies performed during the war between other residents of Texas."

Honorable Benton Coopwood, page 3

We think your letter poses a question of great importance and of much consequence to the public at the moment of these troubled times.

Generally speaking, the relations, duties, obligations and consequences flowing from the marriage contract are so important to the peace and welfare of society as to come under the control of the State, independent of the will of the parties. The Legislature may impose such restrictions upon the marital relations as propriety, morality, and social order demand, provided such regulations are not prohibitory. The regulation of the marriage relation is exclusively within the power of the several states and is not subject to Congressional action. Stated another way, the power of regulation of marriages within a state belongs to that state and not to Congress or another state. The Legislature may prescribe who may marry; the age at which they may marry; the procedure and form essential to constitute marriage; the duties and obligations the marital relationship creates; its effect upon the property rights of the parties, both present and prospective; and the acts which may constitute grounds for dissolution of the marriage. (Ruling Case Law, Vol. 18, pp. 386-7; C. J., Vol. 38, pp. 1275-6; American Jur., Vol. 35, pp. 186-9; Tex. Jur., Vol. 28, pp. 701-2, and authorities cited therein). The Legislature of this State has enacted various statutes regarding most of these things just mentioned. A common-law marriage is valid in Texas, but the elements and essentials of such marriage will be more fully discussed herein.

We quote from Vernon's Annotated Civil Statutes such provisions as are pertinent to the subject under discussion.

"Art. 4602: All licensed or ordained ministers of the gospel, Jewish rabbis, judges of the district and county courts, and justices of the peace are authorized to celebrate the rites of matrimony between persons legally authorized to marry."

"Art. 4604: Persons who desire to marry shall procure from the County Clerk a license directed to all persons authorized by law to celebrate the rites of matrimony, which shall be sufficient authority to celebrate such marriage."

"Art. 4604c: Before the County Clerk shall issue any marriage license the man shall produce a certificate from a reputable licensed physician to show that he is free from all venereal diseases."

Honorable Denton Coopwood, page 4

It might appear from a reading of the foregoing statutes that they are mandatory and that for a marriage to be valid they must be strictly complied with. However, it has long been established in this State that these statutory provisions are not mandatory but are merely directory, and that a valid marriage may be entered into without complying with all or any of these requirements. Grigsby v. Reib, 153 S.W. 1124; Thompson v. Thompson, 202 S. W. 175; Bobbitt v. Bobbitt, 223 S.W. 478; Speer's Laws of Marital Rights in Texas, 3d Ed. 1929, Sec. 10. It is also the rule in this State that even though a marriage be held void as a statutory marriage that such marriage may be valid under the rules of common law if the parties have fulfilled the requirements for a common-law marriage, (Holder v. State, 29 S. W. 793; Chapman v. Chapman, 32 S. W. 564); therefore, in considering your first two questions we must of necessity view them both in the light of the statutory rules and in the light of the common-law rules.

As for the proposition that a common-law marriage is valid in Texas, the law is so well settled in this jurisdiction that it is unnecessary to cite the authorities.

We see then that two parties, who are otherwise legally competent to marry, may enter into a valid marriage either by following the statutory procedure, that is, by procuring a license and celebrating the rites of matrimony before a duly authorized official, or they may enter into a valid marriage by fulfilling the requirements for a common-law marriage.

In either type of marriage, that is, statutory or common-law, the law proceeds on the theory that for two parties to reach the status of husband and wife there must be a contract whereby the parties do by words of the present tense agree to become thenceforth and unconditionally husband and wife, and that since a marriage is more than merely a contract there must be a consummation of such agreement. In a statutory marriage we encounter no difficulty in finding the consummation of the agreement. The courts have held the solemnization celebration had before a duly authorized official to be sufficient consummation of the agreement and have required no further act or acts on the part of the parties for the marriage to be perfectly valid. Thompson v. Thompson, 202 S.W. 175; Lopez v. Missouri, K & T Ry. Co. of Texas, 22 S.W. 695; Speer's Law of Marital Rights in Texas, supra, Section 14.

The conclusion then is that where the parties procure the license and solemnize their vows before a duly authorized official that even though they should then part and never see each other again they are nevertheless husband and wife. Speer's Law of Marital Rights in Texas, supra, Section 14.

Honorable Benton Coopwood, page 5


As to what is required for a valid common-law marriage, the law is not as clear and definite as in the case of a statutory marriage. However, it is settled, as we have stated above, that there must be the agreement and that such agreement must be consummated. Grigsby v. Reib, supra; Berger v. Kirby, supra; Speer's Law of Marital Rights in Texas, supra, Section 30, (and the authorities cited therein.) The text cited correctly states the law on this point. We quote therefrom:

"A common-law marriage, as that term is now understood in this State, is one not celebrated according to the prescribed forms of statute law, but one which arises from the agreement between capable contracting parties to become husband and wife, followed by an actual assumption of that relation. In other words, it is the agreement of capable parties together with cohabitation as man and wife."

Therefore, to be a valid common-law marriage, the marriage contract must be consummated by cohabitation. As stated in the case of Grigsby v. Reib, supra, "the cohabitation must be professedly as husband and wife." See also Berger v. Kirby, supra; Schwingle v. Keifer, et al, 153 S. W. 1132; Bobbitt v. Bobbitt, 223 S. W. 478; James v. James, 253 S. W. 1112; Reed v. State, 255 S.W. 619; Bell v. Southern Casualty Co., 267 S.W. 531; Salvini v. Salvini, 2 S.W. (2) 963; Martinez v. Martinez, 6 S.W. (2) 408; Humble Oil & Refining Co. v. Jeffrey, 38 S.W. (2) 374; Wristen v. Wristen, 119 S.W. (2) 1104.

In McChesney v. Johnson, 79 S. W. (2) 659, it is said:

"The agreement is fundamental and cohabitation is an element, but the holding out to the public as being man and wife is the acid test." (Emphasis ours)

Since it is the law in Texas that cohabitation is required in cases where it is sought to uphold the validity of a marriage by the rules of common law, the question arises, what act or acts on the part of the parties will fulfill the cohabitation requirement? There exists some confusion on this, due mostly to the fact that the courts have used only general terms in their discussions, and have not undertaken to state specific acts. Even though this be true, it indicates a recognition of a broad and not a narrow rule of construction with respect to the act or acts relied upon to show cohabitation. The broad generic terms thus used, however, all indicate the one outstanding purpose, that is, to require a final consummation of the agreement for common-law marriage by some act of the parties fairly evidencing their intention to assume such status.

Honorable Benton Coopwood, page 6

The Court of Criminal Appeals on overruling a motion for rehearing in Reed v. State, supra, held that not only must there be cohabitation and living together but that such must be professedly as husband and wife.

The El Paso Court of Civil Appeals in Texas Employers Ins. Ass'n. V. Soto, et al, 294 S.W. 639, held that the agreement must be followed up by a living together as husband and wife.

To cite further authorities would merely add length and not weight, for we have reviewed the cases and can come to no other conclusion than that the courts, whether they use the term "living together," "cohabiting together," "cohabiting and living together," or "living together," "holding out to the public," "assuming the status," and the like, note the same principle, that is, that besides the agreement and the public acknowledgment the parties must live together as husband and wife. We can draw no other conclusion than this, when the courts have stated that there must be a living together or cohabitation in view of the following definition of cohabitation given by Judge Blair of the Austin Court of Civil Appeals in Humble Oil & Refining Company v. Jeffrey, supra:

"As a second act looking to marriage, this agreement was immediately followed by cohabitation of the parties, which means, as applied to common-law marriages, and to this case, living together, claiming to be married, in the relationship of husband and wife, doing those things ordinarily done by husband and wife, * * *."

For a similar definition of cohabitation, see Speer's Law of Marital Rights in Texas, supra, Section 33, and 28 Texas Juris., Section 19, page 716.

Your request for an opinion, of course, contemplates advice with respect only to the laws of Texas. While, as above shown, Texas does recognize common-law marriages to be as valid and sacred as statutory marriages, there are other states where common-law marriages are not thus recognized, and we do not, and cannot speak with reference to the laws of such states. Our opinion is confined to the status of persons entering into a common-law marriage in this State, and in other states where the general rule of comity applies that the validity of a marriage is determined by the law of the state wherein such marriage is consummated. So that, your questions have a possible scope beyond territorial limits of Texas.

Honorable Benton Coopwood, page 7

We assume that your request grows out of the fact that thousands of our unmarried men and women are in the active service in the Army of the United States, some of whom are in other lands far distant from Texas, and that your questions have become important and even acute because of the natural desire which arises under such circumstances for a marriage without the necessity for complying with the statutory formalities often difficult, or even impossible of observance.

Bearing in mind what we have already said as to the nature and importance to the peace and welfare of society, and bearing further in mind that the institution of marriage is the Divine method of peopling the world, and is favored by all civilized governments, and that the construction of all laws pertaining to marriage, therefore, are liberally construed to support rather than to destroy marriage, and that all reasonable presumptions are indulged in favor of good faith, innocence and purity of attempts to create marriage.

We have dwelt largely upon what is known as "common-law marriages." This, however, has not been without purpose. Technically, there is no such classification in the law books as "proxy marriages." The accepted classification of marriages as to validity are "statutory marriage" and "common-law marriage." The term "Common-Law Marriage" includes all marriages not performed or celebrated under the regulations of the statutes, so that whether or not a so-called "proxy marriage" is valid depends in turn upon whether the facts surrounding the association constitute a "common-law marriage." If so, it is valid to the same extent legally that a ceremonial or statutory marriage is valid; that is, valid as between the parties and all the world. There exist possible exceptions to the universality of validity with respect to a common-law marriage. A common-law marriage consummated in Texas may be invalid in another state or country whose laws forbid such marriages. But the same thing may be said of a statutory marriage in a state which permits the intermarriage of blacks and whites. Many states like Texas forbid such a union, and such a miscegenacious marriage valid in the law of its celebration or consummation is invalid in a State where, like Texas, such marriages are expressly forbidden.

In a ceremonial marriage we may assume, though we do not need to decide, that the actual presence of both parties is necessary to the celebration of the rites. With respect to a common-law marriage, we have seen that it consists of two legal elements, the existence of each of which is essential, that is, proper mutual agreements for marriage, and the following up of cohabitation or living together in the marital sense. Every essential to the

Honorable Benton Coopwood, page 8

validity of the common-law marriage, therefore, may be, and usually
is brought into existence without any character of ceremony whatso-
ever. Indeed, the contract for marriage -- whether ceremonial or
common-law -- is universally almost in private when no other eye
sees and no other ear hears. Ordinarily, if there is a listener-
in, he is an eavesdropper on the lovers. Under no conception of
common-law marriage is the necessary cohabitation, living together,
holding out to the public, actual assumption of the status, and the
like, required or contemplated to be accompanied by any sort of cere-
mony. Our laws governing this sacred relation, as we have seen,
deal with the substance and not the form of marriage.

Specifically, the performance of a ceremony by any one of
any character in connection with a common-law marriage, would not
hurt, neither would it help in the eyes of the law. It would, how-
ever, constitute indubitable evidence of the voluntary assumption
of the marital status of the parties, in this, that it would be a
public holding-out by both parties consenting thereto, thus supply-
ing immediately the essential cohabitation or living together in a
matrimonial sense of the contracting parties. This holding-out
would likewise appear where one of the parties stood before the pub-
lic and the other joined in the ceremony by the use of telephonic
connection. Such public holding-out is precisely that public hold-
ing-out -- consummation -- cohabitation -- which necessarily follows
a purely statutory ceremonial marriage. We can think of no more ap-
propriate consummation of a common-law marriage, where by stress of
ill fortune the parties cannot join physically their presence at the
nuptial announcement, than that of a proxy or telephonic public cel-
ebration. Such a union is holy, and violates no law of God or man.

Specifically, it may be said here, however, that the cele-
bration of the rites through a third person as proxy would have to
be authorized factually by the absent marital partner. Such author-
ization may be given orally, or in writing, witnessed or unwitnessed.

The first essential, of course, of any contract for mar-
riage must be the mutual consent and agreement of the contracting
parties. There is no statute or decision in this State requiring
such mutual agreement for marriage to be in writing. It may, there-
fore, as well be oral. Indeed, such lovers' contracts are usually
oral. However, it is indeed quite fitting, and even most desirable,
that parties intending to consummate a common-law marriage should
reduce their agreement for the marriage to writing, though it is not
necessary, as above explained. Such contract may be made as any other
civil contract between competent parties in any of the ways by which
contracts are allowed to be evidenced -- that is, by oral agreement,
by telephone communication, by telegraph, or by the more-enduring

form of a writing, which need not be witnessed or notarized.

Honorable Benton Coopwood, page 9

In this connection, it must be understood, however, that as in all other instances of common-law marriage, the telephonic agreement to become man and wife presently must be followed up by the actual assumption of that relation, as in any other form of pre-contract for such marriage.

We will here make plain the holding of this department with respect to the second element of validity of common-law marriages in Texas with respect to the consummation of the con-tract to become husband and wife.

Admittedly, Grigsby v. Reig, 153 S. W. 1124, is the out-standing decision in this State dealing with our immediate subject. It was written by Chief Justice Brown. It has often been cited and followed, but never departed from nor overruled.

Predicating his arguments, the learned Chief Justice clearly states the two lines of thought prevalent in this coun-try. He says:

"In the courts of the different states of the United States, there are two lines of cases between which we must choose, which Mr. Freeman in his notes to cases in 124 Am. St. Rep. 111, 112, states, in substance, as follows: Both lines of authority rest upon the doctrine that marriage is a civil contract, and that no marriage can be binding which does not rest upon the consent of the parties. One rule is 'that a marriage is complete when the parties agree, in words of the present tense, to take each other as husband and wife'. That statement of the law is indorsed by Mr. Freeman, in support of which he cites a number of cases. The other rule is stated thus: 'An assumption of the marriage sta-tus is essential to a common-law marriage, that an agreement presently to be husband and wife is not sufficient to constitute marriage, until it is acted upon by the parties.'"

We quote this portion of the opinion for the purpose of making a critical study of the rule which Judge Brown has chosen, and which choice there made is the established law of this State, and to make a careful analysis of it to see just what act or acts of the principals, beyond the preliminary con-tract to be married, are essential and sufficient to consummate the marriage.

Honorable Benton Coopwood, page 10

The words constituting this controlling rule were carefully selected by him after the most painstaking examination of the authorities throughout the country. There are two phrases in his definition indicating what the second element must be to create a valid common-law marriage. They are the following: First, "An assumption of the marriage status", and, second, the agreement to marry is not sufficient "'until it is acted upon by the parties.'" This is plain and unambiguous language, easily understood by any one familiar with legal terminology. Rephrased, it means that the mere agreement for marriage is not true marriage until the parties thereto have assumed the marriage status by some appropriate action. Underlying the whole opinion so carefully prepared by him lies that clear view entertained by the Chief Justice, that mere agreement presently to become husband and wife does not consummate the common-law marriage. It must be acted upon by the parties in such a way as to show to the public that the parties have voluntarily assumed the status of husband and wife. The Chief Justice, it will be seen, did not find it necessary to state in his rule of essentials just what would be an assumption of the marital status, or what particular act would be considered as one done in pursuance of the agreement for marriage. Neither has he made such effort in the lengthy discussion that followed. Indeed, it could not be done by any such rule of thumb, nor by the use of any all-inclusive word or phrase.

In discussing the rule as to this essential feature of consummation, he has several times used the word "cohabitation". But he has not done so at all points throughout the discussion. On the contrary, he has as frequently employed other words and terms, such as "other acts of consummation"; "acted upon by the parties"; "any form of consummation"; "by acts of consummation"; "when the relation was assumed"; "by their conduct towards each other"; "living together", and the like words and terms. These expressions of the Chief Justice are but illustrations of his meaning of the adopted rule that the initial contract for marriage is not effective until it has been assumed by the parties through some act in recognition thereof, indicating the intention to perform the contract by beginning the status connoted by it. They signify precisely what the word "cohabitation" signifies.

The word "cohabitation" is a perfectly good word in this connection, but it is of broader significance than the layman's mind attributes to it. It is an all-comprehensive term, and is not used in the narrow and perhaps most popular sense -- that of sexual coition. It merely means the living together of a man and woman under agreement for marriage in a matrimonial sense -- that is, in the usual and ordinary manner of married

Honorable Benton Coopwood, page 11

persons, such as occupying the same house and bed, the holding out of each other as husband and wife, the introduction by one or the other as husband or wife, the adopting by the woman of the husband's name, and the use thereof, the execution of deeds or other instruments in a manner indicating their status to be husband and wife, the addressing of each other as husband and wife, in short, the doing of those things great or small commonly done by husband and wife. Any one or more of the acts herein enumerated, however quickly or belatedly done after the initial agreement, will have probative force sufficient to consummate the marriage having its inception in the previous contract. The particular act, the number of the acts, and the time within which they shall be performed or done cannot be stated with definite finality, and no rule of public policy, statute or reason requires that they should be so stated. It is enough for validity, if the parties do any such act clearly evidencing their intention thereby to do it because of their contract of marriage, and as a carrying out of the promises previously exchanged.

It can make no difference where such act or acts of assumption or holding-out take place. There is nothing under the laws of Texas requiring such acts of assumption and consummation to be done in Texas. A holding-out by the husband or wife necessarily means to those persons with whom he or she comes in contact in their ordinary affairs wherever they may be.

Where the contract for marriage is made in the State, or looking to consummation or performance in Texas, the act amounting in law to consummation by the husband or the wife, as the case may be, may be done in Texas, or any other state. The act of holding out one's marriage to the public, or the doing of an act as a matrimonial or connubial act, is a thing of intention and not of state or territorial lines.

It is not necessary to go outside of Texas for authorities, but we will add one or two cases.

In the case of Peterson's Estate, 134 N. W., p. 758, the Supreme Court of North Dakota said:

"It is apparent that, though sometimes ignored, it is necessary that an assumption of marriage relations be had to constitute a common-law marriage. 1 Bishop on Marriage, Divorce and Separation, Sec. 380, Campbell v. Campbell, 1 HL. 182, 211; Bishop v. Brittain Investment Co.,229 Mo. 699, at p. 728, 129 S. W. 688 at p. 677, from which we quote: 'Cohabitation as husband and wife is a manifestation of the parties

having consented to contract that relation inter se.  It is a holding forth to the world by the manner of daily life, by conduct, demeanor, and habit, that the man and woman who live together have agreed to take each other in marriage and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors, friends and acquaintances, to these representations and their continued conduct, then habit and repute arise and attend upon the cohabitation, and the parties are holden and reputed to be husband and wife.'"

Bockman v. Bockman (Ark) 165 S. W. (2d) 256 is very informative in this connection.  There the husband sued his wife in the Chancery Court of Arkansas for a divorce upon the following statutory ground:

"Where either husband or wife have lived separate and apart from the other for three (3) consecutive years, without cohabitation, the court shall grant an absolute decree of divorce at the suit of either party, * * *,"  (emphasis ours)

The suit was contested by the wife, and the divorce was denied, the court holding:

"Bouvier defines cohabitation:  'It does not necessarily mean living together under the same roof; a man may be absent on business, * * * and yet be cohabitating in the broader sense.'  1 Bouv. Law Dict., Rawles Third Rev. p. 519. * * *

"We think the preponderance of the testimony supports appellant's contention that there was no agreement, understanding or conscious knowledge upon the part of appellant, Mrs. Bockman, that she and her husband were separating within the meaning of the statute when he came to Arkansas in May, 1937, seeking a new location. Her testimony is positive that it was understood that her intention was to follow her husband to his new location after he became established and was ready for her to join him.  The letters in evidence are of a friendly nature and are not sufficient to inform appellant of any intention in appellee's mind that he had separated from Mrs. Bockman within the meaning of the statute.  While it is true that these parties have lived separate and